759 P.2d 1327

**Henry WHITE and Sandra White, his wife, Plaintiffs–Appellees,**

v.

**Christopher MITCHELL and Deborah Mitchell, his wife; D.L. Sitton Motor Lines, Inc., a foreign corporation, Defendants–Appellants.**

**No. 1 CA–CIV 9687.**

Court of Appeals of Arizona, Division 1, Department A.

Aug. 4, 1988.

Vermeire & Turley, P.C. by Kent E. Turley, Phoenix, for plaintiffs-appellees.

Sorenson, Moore, Evens & Burke by George R. Sorenson and John S. Schaper, Phoenix, for defendants-appellants.

## OPINION

EUBANK, Judge.

Christopher Mitchell and D.L. Sitton Motor Lines, Inc. appeal from an adverse judgment for compensatory and punitive damages entered on a jury's verdict and from the denial of their motion for new trial in Henry and Sandra White's action for personal injuries sustained by Henry White. Appellants raise the following issues for our consideration: (1) whether the jury was erroneously instructed on punitive damages; and (2) whether the instructions to the jury were conflicting, confusing, and inconsistent with the verdict form. We have jurisdiction pursuant to A.R.S. § 12–2101(B) and (F)(1).

*Facts and Procedural History*

Henry White was driving his automobile east on Thomas Road in Phoenix at about 5:30 p.m. on March 25, 1985. He intended to turn left on 51st Avenue and proceed north. Immediately ahead of him was a vehicle driven by Denise Bauer, who also intended to turn left at 51st Avenue.

Bauer entered the intersection while the traffic light was green for traffic on Thomas. While the light remained green, Bauer was unable to turn left because there was too much oncoming traffic. When the traffic signal turned yellow, Bauer observed two cars and a truck approaching the intersection from the east on Thomas Road. The two cars were almost stopped at the crosswalk, and the truck, which was farther back, looked as if it would have been able to slow down. Bauer testified:

Q Why did you think he was going to slow down?

A Well, because he was behind those other cars and they had came to a stop. I don't know how hard it is to stop a truck. He was a ways back there. I thought he had plenty of time to stop and slow down because he didn't seem like he was going all that fast that he had to go through the yellow.

After Bauer had been in the intersection "a couple seconds" after the light had turned yellow, she turned left. Bauer estimated the truck's speed to be at least 35 miles per hour. Another second or two after Bauer turned left, she observed the truck hit the car behind her in her rearview mirror.

White's car was beyond the west crosswalk in the left turn lane waiting behind Bauer's car. When the traffic signal turned yellow and Bauer began her left turn, White was about a car length behind her. As the light was changing to yellow, White observed a car in the first westbound lane next to the left-turn lane coming to a halt. Farther down the road, about 250 to 300 feet, he saw a truck. It appeared to him to be proceeding at about the speed limit. Because the light had changed to yellow and the car in the first westbound lane had stopped, White concluded that the truck was going to stop.

White commenced making a normal left turn about two seconds after Bauer commenced hers. When White was across the middle of the intersection and approaching the northern crosswalk along Thomas, he looked to his right and saw the truck bearing down on him. The truck hit the right front side of his car, causing his left hand to hit the steering wheel and injuring it severely.

The tractor portion of the semi tractor-trailer truck that hit White's car was owned by appellant Christopher Mitchell, its driver, who leased it to appellant D.L. Sitton Motor Lines, Inc. The van-trailer portion was owned by Sitton.

On March 25, 1985, following the accident, diesel mechanic Billy Byrd had inspected Mitchell's tractor. He testified that the tractor's brakes did not have the ability to stop the truck to their maximum capacity and that the condition of the tractor indicated it had been totally neglected as to inspection and maintenance. He noted that all of the rear brake shoes were worn out, the brake drums were also worn, that some of the slack adjusters were near or beyond the maximum distance they were designed to go, that the brake shoes had been worn out before the accident, that the brakes had not been adjusted for about 30,000 miles, and that the rivets on the brake shoes were exposed and digging into the brake drums. Byrd further testified that given the condition of the brakes, stopping the truck would take one-third more distance than if the brakes were in good condition, and that that distance would increase if the truck was loaded. He testified he would not expect that all the brakes would be able to lock up.

Byrd also testified that trucks should be inspected daily, repaired as necessary and checked over thoroughly at least weekly. Checking a truck every 90 days is not often enough. He also testified that all one would have to do to see the condition of the brakes on the tractor would be to get under it. In some cases even that would not be necessary, and on this truck one could have seen from the side of the truck that the brakes were worn out. Byrd testified that any experienced driver would know that the brake shoes and drums on this truck were not in a safe and reasonable condition.

Howard Purdy, Byrd's former supervisor, testified that Mitchell's tractor's brake shoes were less than three-eighths of an inch thick, where new shoes would have been one and three-sixteenths inches thick. The rivets in the brake shoes were scoring the brake drums and causing glazing of the brake pads, which resulted in metal-to-metal contact and reduced the tractor's braking. All eight of the brake shoes on the tractor were worn out. Purdy testified that the brake shoes were so far out of adjustment that they would travel up to the maximum of three inches before making contact with the brake drum. This would reduce the pressure that the shoes were capable of applying to the drums, and would make wheel lock-up less likely. At a minimum, brakes on an eighteen-wheeler should be adjusted every 10,000 miles under industry practice.

White's accident reconstructionist, Richard Roller, testified that in his opinion Mitchell was about 423 feet from the easternmost crosswalk along 51st Avenue when the traffic signal turned yellow, about 300 feet from that point when Bauer made her left turn two seconds into the yellow light, and about 133 feet away when the traffic signal turned red. He testified that Mitchell was traveling at 45–50 miles per hour before he began to skid. If Mitchell's tractor had had good brakes, a reasonable speed under the circumstances would have been no more than 40 miles per hour. Roller testified that given the actual condition of Mitchell's brakes, a reasonable speed would have been 0 miles per hour, because the truck should not have been on the road.

Roller testified:

Q  Can you speak to where the driver of this vehicle, assuming he drove from Joplin, Missouri, to Phoenix and was on his way to California to get another load, and the accident happened—assuming that to be the case, the man was an experienced driver—anyway, he would not have known

his brakes were out of adjustment, there was this extra lag time?

A In my opinion, there would be no possible way he would be unaware of the brake conditions.

Q How about as to somebody knowledgeable in inspecting the brakes? Would there be any difficulty knowing, seeing the brakes were out of adjustment, the drums were worn?

A No. The reason is, first of all, you don't have to—like on passenger cars, you don't have to jack the car up and get it adjusted. . . . The air brake system [on a truck] is exposed and you can see the shoes, the drums, and you can see the push rods and everything. The adjustment, for example, the drums you don't even need to get down and look. You can merely put your hand behind there and feel the wear on the drums. You can easily see the push rods are out of adjustment.

Roller also testified that if Mitchell's truck's brakes had not been worn out and out of adjustment, Mitchell could have avoided the accident, because it was the lag time in the effective operation of his brakes that kept Mitchell's evasive action from being successful.

Sitton first took Mitchell on as a driver on May 17, 1983. The day before, Stanley Edens, supervisor of trailer maintenance for Sitton, gave Mitchell a road test, which included stop lights, left turns, right turns, two-lane roads, four-lane roads, railroad crossings and general traffic. In Edens' judgment, Mitchell satisfactorily passed all those tests. Eight days after Sitton hired Mitchell, Sitton received a report on Mitchell's driving record indicating that his license had been suspended for three months in September of 1982 for three speeding tickets. Although Mitchell's employment application had asserted that his driver's license had not previously been suspended, Sitton did not discharge Mitchell at that time.

A further motor vehicle report on Mitchell should have been ordered for January of 1984, but was apparently not received. Sitton ordered no motor vehicle report on Mitchell for January of 1985. If it had done so, it would have been informed that Mitchell committed three more speeding violations from March through December of 1984.

Edens testified that according to federal regulation, tractors driven by Sitton's owner-operators were to go through Sitton's shop every 90 days for a complete inspection of all systems. Sitton actually inspected Mitchell's tractor on May 9, 1983; December 16, 1983; June 15, 1984; January 23, 1985; and July 23, 1985. Edens could not say why seven months elapsed between the June 1984 and January 1985 inspections, and testified that this should not have occurred. He testified that if one of Sitton's vehicles got on the road without being inspected after 90 days, that would be contrary to the policy of Sitton's inspection department.

Sitton's inspection report from January 23, 1985, two months before the accident, indicated "[n]o defects as to brakes." If a systematic maintenance inspection had revealed that the brakes on Mitchell's truck had brake pads worn out almost to the rivets, Sitton would have noted this on the inspection sheet and would have declined to issue Mitchell a load until the brakes were fixed. Further, if Mitchell's truck had been inspected in early March 1985 and had been in the condition that Billy Byrd's post-accident inspection had revealed, the truck would have been "deadlined."

On March 19, 1985, six days before the accident, a motor vehicle report was run on Mitchell. Diana Burkhart, Driver Personnel Director for Sitton, received the report on March 21, 1985. It indicated that Mitchell's driver's license had been suspended for 60 days beginning February 10, 1985, but had been reinstated nine days later. Burkhart told Safety Director Jerry Cornwell about this, and also spoke to Mitchell. Although Burkhart testified that the reinstatement of Mitchell's license was more than likely the result of a hardship application made by Mitchell, Mitchell told Burkhart he was not aware his license had been suspended. Burkhart did not instruct Mitchell to return to Joplin immediately,

though she had authority to do so. Instead, Burkhart "told him we needed to work him back into Joplin." Mitchell was to return to straighten out his license.

White and his wife brought this action against Mitchell and his wife and Sitton on November 27, 1985. It was tried before a nine-person jury, which returned a seven-person majority verdict as follows on January 14, 1987:

> We, the Jury, duly empaneled and sworn in the above entitled action, upon our oaths, do find in favor of the Plaintiff, HENRY WHITE, and find the damages to be $330,000.00 and SANDRA WHITE $10,000.00.
>
> We find the relative degrees of fault to be:
>
> | | |
> |---|---|
> | Defendant Sitton | 70 % |
> | Defendant Mitchell | 30 % |
> | | 100 % |
>
> We assess punitive damages against Defendant Sitton in the amount of $100,-000.00.
>
> We assess punitive damages against Defendant Mitchell in the amount of $30,-000.00.

(Underlined portions filled in by jury.) The trial court entered judgment in accordance with the verdict on January 27, 1987. By formal order entered March 18, 1987, the trial court denied appellants' motion for remittitur and motion for new trial. This timely appeal followed.

*Should the Trial Court Have Instructed the Jury on Punitive Damages?*

We first examine appellants' argument that the trial court's instruction on punitive damages was an inaccurate statement of the law. The trial court instructed:

> Only if you have awarded compensatory damages, you may also consider whether to award plaintiffs White punitive damages against defendants Mitchell and/or D.L. Sitton, Inc. Such damages are awarded in excess of full compensation to the plaintiff in order to punish the defendant and to deter others from emulating his conduct.

Such damages are exemplary or punitive damages. To recover exemplary or punitive damages, plaintiffs White must prove by clear and convincing evidence that said defendants consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. They must also prove aggravated and outrageous conduct by the defendants.

Appellants now contend that the wording of this instruction failed to convey the "evil mind" requirement for recovery of punitive damages under *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565 (1986) and *Linthicum v. Nationwide Life Insurance Co.,* 150 Ariz. 326, 723 P.2d 675 (1986). In the trial court, however, appellants' counsel objected to the giving of the trial court's instruction based only on the contention that the evidence was insufficient to warrant submitting the issue of punitive damages to the jury. Moreover, appellants' counsel not only failed to challenge the correctness of the proposed instruction's text, but also repeated part of that instruction almost verbatim in stating his understanding of the then current criteria for punitive damages under Arizona law. Rule 51(a), Arizona Rules of Civil Procedure (Rule), provides in part:

> No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

An appellant's failure to raise a specific ground of objection to an instruction before the trial court precludes him from arguing that ground on appeal. *Long v. Corvo,* 131 Ariz. 216, 639 P.2d 1041 (App.1981); *Watson Construction Co. v. Amfac Mortgage Corp.,* 124 Ariz. 570, 606 P.2d 421 (App. 1979). Further, a party who is dissatisfied with instructions the trial court proposes to give is under a duty to submit other instructions for the trial court's consideration. *See Dubreuil v. Gardner,* 99 Ariz. 312, 409 P.2d 23 (1965). In our opinion appellants failed to preserve on appeal their challenge to the wording of the trial court's punitive damages instruction.

Moreover, unlike appellants, we do not read Rule 59(c)(3), to provide that a party's mere assertion, in a motion for new trial, that error was made in instructing the jury requires either the trial court or this court "to review the propriety of all instructions" where the party has failed to comply with Rule 51(a).

We next address appellants' contention that the evidence did not justify a punitive damages instruction as to either Mitchell or D.L. Sitton Motor Lines, Inc. In a line of cases beginning with *Rawlings v. Apodaca,* our supreme court narrowed and restated the circumstances under which punitive damages may be awarded in Arizona. *See generally* Schmidt, *Punitive Damages in Arizona: The Reports of Their Death Are Greatly Exaggerated,* 29 Ariz.L.Rev. 599 (1987). In *Rawlings* the court stated:

We do not believe that the concept of punitive damages should be stretched. We restrict its availability to those cases in which the defendant's wrongful conduct was guided by evil motives. Thus, to obtain punitive damages, plaintiff must prove that defendant's evil hand was guided by an evil mind. The evil mind which will justify the imposition of punitive damages may be manifested in either of two ways. It may be found where defendant intended to injure the plaintiff. It may also be found where, although not intending to cause injury, defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others. *See Grimshaw v. Ford Motor Co.,* 119 Cal.App.3d 757, 809, 174 Cal.Rptr. 348, 381 (1981). It has been stated that action justifying the award of punitive damages is "conduct involving some element of outrage similar to that usually found in crime." Restatement (Second) of Torts § 908 comment b; see also W. Prosser & W. Keeton, [*The Law of Torts,*] § 2 at 9. Applying this analogy, punitive damages will be awarded on proof from which the jury may find that the defendant was "aware of and consciously disregard[ed] a substantial and unjustifiable risk that" significant harm

would occur. See A.R.S. § 13–105(5)(c), defining criminal recklessness.

151 Ariz. at 162, 726 P.2d at 578. In *Linthicum v. Nationwide Life Insurance Co.,* the court further defined the "evil mind" prong of the test for punitive damages under *Rawlings.* The court stated:

As discussed earlier, it is the "evil mind" that distinguishes action justifying the imposition of punitive damages. See *Rawlings v. Apodaca,* supra. In whatever way the requisite mental state is expressed, the conduct must also be aggravated and outrageous. It is conscious action of a reprehensible character. The key is the wrongdoer's intent to injure the plaintiff or his deliberate interference with the rights of others, consciously disregarding the unjustifiably substantial risk of significant harm to them. *Rawlings v. Apodaca,* 151 Ariz. 161, 726 P.2d at 577. While the necessary "evil mind" may be inferred, it is still this "evil mind" in addition to outwardly aggravated, outrageous, malicious or fraudulent conduct which is required for punitive damages. We hold that before a jury may award punitive damages there must be evidence of an "evil mind" and aggravated and outrageous conduct.

150 Ariz. at 331, 723 P.2d at 680.

The supreme court further extended its analysis in *Gurule v. Illinois Mutual Life and Casualty Co.,* 152 Ariz. 600, 734 P.2d 85 (1987). There the court stated:

In summary, the propriety of awarding punitive damages turns upon the defendant's state of mind. Intent to injure or defraud, or pursuit of wrongful conduct with conscious disregard of the probability of some injury or damage to the rights and interests of others all qualify as forms of "evil mind," justifying imposition of punitive damages. We abandon such terms as "gross," "reckless," and "wanton" conduct. They convey little, and fail to focus the jury's attention on the important question—the defendant's motives. The quality of defendant's conduct is relevant and important only because it provides one form of evidence

from which defendant's motives may be inferred. The more outrageous or egregious the conduct, the more compelling will be the inference of "evil mind." Of course, defendant's state of mind may be evidenced by other factors and may be established or inferred even if defendant's conduct was outwardly unexceptional. The inquiry in every punitive damage case focuses on the defendants' state of mind, which may be established by either direct or circumstantial evidence.

152 Ariz. at 602, 734 P.2d at 87. *See also Volz v. The Coleman Company, Inc.,* 155 Ariz. 567, 748 P.2d 1191 (1987); *Bradshaw v. State Farm Mutual Automobile Ins. Co.,* 157 Ariz. 411, 758 P.2d 1313 (May 18, 1988); *Ranburger v. Southern Pacific Transportation Co.,* 157 Ariz. 551, 760 P.2d 551 (1988). In addition, the supreme court has made it clear that a jury will not be permitted to consider an award of punitive damages if the evidence supporting such an award is only slight and inconclusive. *See Filasky v. Preferred Risk Mutual Insurance Co.,* 152 Ariz. 591, 599, 734 P.2d 76, 84 (1987); *Farr v. Transamerica Occidental Life Insurance Co.,* 145 Ariz. 1, 9, 699 P.2d 376, 384 (App.1984) (approved in *Rawlings v. Apodaca,* 151 Ariz. at 161, 163, 726 P.2d at 577, 579).

In our opinion the evidence presented at trial was sufficient to justify a punitive damages instruction as to Mitchell's conduct. Though the evidence was largely circumstantial, the jury could have found that Mitchell was well aware he was driving a tractor-trailer rig that was in such dangerous condition that its continued operation gave rise to a very substantial risk of causing serious personal injury or death to pedestrians or other motorists, and yet deliberately persisted in doing so over a long period of time. The trial court correctly instructed the jury on the issue of punitive damages as to Mitchell.

We reach the opposite conclusion, however, with respect to punitive damages against appellant D.L. Sitton Motor Lines, Inc. The evidence would unquestionably have supported a finding that Sitton's retention of Mitchell as a driver, and its failure to ensure regular and adequate inspection of his truck or exercise due care to prevent him from operating a dangerous vehicle, constituted gross, wantonly negligent conduct. *See Nichols v. Baker,* 101 Ariz. 151, 416 P.2d 584 (1966). There was, however, no sufficient evidence from which any jury could reasonably have found that Sitton, like Mitchell, was *aware of* and *consciously disregarded* a substantial and unjustifiable risk that significant harm would occur, such that it could be characterized as having acted with the requisite "evil mind." *Rawlings v. Apodaca,* 151 Ariz. at 162, 726 P.2d at 578. In contrast to the situation with Mitchell, the case for punitive damages against Sitton was no more than slight and inconclusive. *Farr v. Transamerica Occidental Life Insurance Co.,* 145 Ariz. at 9, 699 P.2d at 384. Further, the supreme court has expressly barred awards of punitive damages based on gross negligence or mere reckless disregard of the circumstances. *Volz v. The Coleman Company, Inc.,* 155 Ariz. at 570, 748 P.2d at 1194. The award of $100,000 punitive damages against Sitton must accordingly be vacated.

We reject Mitchell's argument that White failed to introduce sufficient evidence from which the jury could have determined an appropriate amount of punitive damages to award against him. Contrary to Mitchell's argument, *Hawkins v. Allstate Insurance Co.,* 152 Ariz. 490, 733 P.2d 1073 (1987) does not require specific proof of Mitchell's "wealth, property, income, education, earning capacity, debts, savings, or credit." The plaintiff, in a punitive damages case, need only introduce evidence sufficient to allow the trier of fact to calculate an award that is reasonable under the circumstances. *Hawkins v. Allstate Insurance Co.,* 152 Ariz. at 497, 733 P.2d at 1080. It is true that *Hawkins* listed the defendant's financial position among the elements of relevant proof on this point, but it did not hold that such evidence was always required. Here, though no comprehensive information was introduced con-

cerning Mitchell's financial circumstances, it was at least clear from the evidence that he owned the tractor involved in the accident.

■ Another element of relevant proof *Hawkins* mentioned was "the nature of the defendant's conduct, including the reprehensibility of the conduct and the severity of the harm likely to result, as well as the harm that has occurred...." *Id.* at 497, 733 P.2d at 1080. The record contains ample evidence from which the jury in this case could have intelligently evaluated that factor in its deliberations.

### Instructions and Form of Verdict

■ Appellants also argue that the trial court erred in instructing on comparative negligence and submitting a form of verdict that allowed apportionment of fault between Mitchell and Sitton. Appellants note that the trial court instructed in part as follows:

> 1) If you find that defendant Chris Mitchell was not negligent or that defendant's negligence was not a cause of the plaintiff's injuries, then said defendant was not at fault and your verdict must be for defendants' [sic] Chris Mitchell and D.L. Sitton Motor Lines, Inc.
>
> \* \* \* \* \* \*
>
> You are further instructed that pursuant to an applicable federal statute and regulation, D.L. Sitton, Inc., as a matter of law had control of and is responsible for Mr. Mitchell's operation of the tractor he leased to D.L. Sitton, Inc. You are further instructed that, by reason of said statute and regulation, D.L. Sitton, Inc. is required to inspect the leased vehicle.
>
> The statute and regulation create an irrebuttable presumption that Mitchell was the employee of Sitton at the time of the accident.
>
> If Mitchell, at the time of the accident, was driving on an errand for Sitton, Sitton is liable for Mitchell's negligence, if any. It makes no difference whether Sitton had, or exercised any control over Mitchell's conduct.

Appellants assert that no instruction was given under which the jury could have found against Sitton based on its own independent negligence. They argue:

> Since the instructions which were given necessarily implied that Sitton's liability could only be derivative, the instructions on comparative negligence and the form of verdict allowing apportionment of fault between Mitchell and Sitton were inherently inappropriate. If Sitton could only be liable for Mitchell's fault, then only Mitchell's negligence could be imputed or apportioned to Sitton, and no basis existed for the jury to find under the instructions that Sitton was 70% at fault in causing the accident.

In our opinion appellants' argument is based on a false premise. The trial court's instructions defined negligence as follows:

> Plaintiffs' claims [sic] the defendant was negligence [sic] and the defendant claims that the plaintiff was negligent. Negligence is the failure to use reasonable care. Negligence may consist of action or inaction. A person is negligence [sic] if he fails to act as an ordinarily careful person would act under the circumstances.

This instruction plainly would have been applicable both to Mitchell's and to Sitton's conduct. The trial court also instructed:

> You are further instructed that if D.L. Sitton, Inc., enacted rules for the safety of others, including the plaintiff, you may consider whether D.L. Sitton, Inc.'s violation, if any, of those rules is negligence. If you should find such violation, you must then determine whether the violation was a cause of the accident.

These instructions gave the jury an adequate legal framework within which it could have found Sitton independently negligent. The trial court's instructions on comparative negligence and the form of verdict it submitted to the jury were accordingly correct.

Because we have determined that the evidence regarding Sitton's conduct was insufficient to support an instruction on puni-

tive damages against it, we do not address Sitton's argument that the instructions and verdict form allowed the jury to assess "double punitive damages" against Sitton.

Appellees White request an award of attorney's fees pursuant to Rule 25, Arizona Rules of Civil Appellate Procedure. We find that appellants' appeal was not frivolous, *see Price v. Price,* 134 Ariz. 112, 654 P.2d 46 (App.1982), and therefore deny the request.

The judgment is reversed to the extent it awards $100,000 punitive damages against Sitton, and is otherwise affirmed.

CONTRERAS, P.J., and JACOBSON, J., concur.