**Rose Lynn KOBAR, by her Guardian and Conservator Melissa Ann KOBAR, Plaintiff,**

v.

**NOVARTIS CORPORATION; Novartis Pharmaceuticals Corporation, Novartis Consumer Health, Inc., Defendants.**

**No. CIV 010156PHXSRB.**

United States District Court, D. Arizona.

June 3, 2005.

John H. Westover, Lawrence H. Lieberman (Cross & Lieberman, P.A.), Phoenix, AZ, David S. Shughart, Phoenix, AZ, and Barry A. MacBan, Tucson, AZ, for plaintiff.

Aton Arbisser, Jan E. Dodd, and William Stoddard (Kaye Scholer LLP), Los Angeles, CA, and Andrew M Federhar (Fennemore Craig), Tucson, AZ, for defendant.

### ORDER

BOLTON, District Judge.

This case arises out of injuries that Plaintiff Rose Lynn Kobar sustained allegedly as a result of ingesting Tavist–D, a drug manufactured by Defendant Novartis Consumer Health, Inc. ("NCH") containing phenylpropanolamine ("PPA"). At issue is Defendant's motion for partial summary judgment on the issue of punitive damages (Doc. 185).

### I. BACKGROUND

Tavist–D is a cold, cough and allergy medicine. One of its ingredients is PPA, a decongestant used in hundreds of commercially-available pharmaceuticals, including Dimetapp, Alka–Seltzer Plus and Contac. On April 1, 1979, Sandoz Pharmaceuticals, Inc. ("Sandoz") submitted to the Federal Food and Drug Administration ("FDA") a New Drug Application ("NDA") to use Tavist–D as a prescription drug. That application was approved on December 15, 1982.

On April 26, 1988, Sandoz filed an NDA with the FDA seeking permission to sell Tavist–D as an over-the-counter ("OTC") drug. The FDA granted permission on August 21, 1992. Between 1996 and 1999, the FDA approved three reformulations of Tavist–D.

On January 1, 1997, Sandoz merged with another pharmaceutical company, Ciba–

Geigy Corporation, creating several new companies. One of the new companies, NCH, became responsible for the manufacture and sale of Tavist–D.[1]

In December 1999, Plaintiff's boyfriend purchased for her a box of Tavist–D. On June 17, 2000, Plaintiff suffered a stroke, which she alleges was caused by her ingestion of Tavist–D. On December 22, 2000, Plaintiff filed an action in Maricopa County Superior Court in Phoenix, Arizona, seeking relief for her personal injuries based on theories of negligence, strict liability and breach of warranty. The complaint demanded punitive damages and named three defendants: NCH, Novartis Corporation, and Novartis Pharmaceutical Corporation, the latter two of which were dismissed in 2001.

On January 25, 2001, the action was removed to the United States District Court. Defendant filed a motion for partial summary judgment on the issue of punitive damages on February 22, 2005.

## II. LEGAL STANDARDS AND ANALYSIS

### A. A.R.S. § 12–701

Defendant argues that it is immune from liability for punitive damages in light of A.R.S. § 12–701 (1989), an Arizona statute which immunizes drug manufacturers and sellers from punitive damages:

A. .... if the drug alleged to cause the harm either:

1. Was manufactured and labeled in relevant and material respects with the terms of an approval license issued by the federal food and drug administration under the food, drug and cosmetic act (21 United States Code § 301, et seq.) ... or

2. Is generally recognized as safe and effective pursuant to conditions established by the federal food and drug ad-

ministration and applicable regulations, including packaging and labeling regulations.

B. Subsection A does not apply if the plaintiff proves, by clear and convincing evidence, that the defendant, either before or after making the drug available for public use, knowingly, in violation of applicable federal food and drug administration regulations, withheld from or misrepresented to the administration information known to be material and relevant to the harm which the plaintiff allegedly suffered.

### 1. A.R.S. § 12–701(A)

No material questions of fact remain with respect to whether Tavist–D satisfies Subsection A of A.R.S. § 12–701 (1998) ("Subsection A"). The FDA first approved Tavist–D on December 15, 1982 as a prescription drug, stating that "we ... have concluded that the drug is safe and effective for use as recommended in the submitted labeling." (Def.'s Statement of Facts, Ex. 8). On August 21, 1992, the FDA approved Tavist–D for use as an OTC drug, again granting Defendant's NDA and deeming Tavist–D "safe and effective." (Def.'s Statement of Facts, Ex. 9). The FDA also approved three reformulations of Tavist–D from 1996 to 1999, each time approving Defendant's supplemental NDA and describing Tavist–D as "safe and effective." (Def.'s Statement of Facts, Ex. 10–12.)

Plaintiff argues that because the FDA never published a finding either that it approved Tavist–D or that PPA is safe and effective. Tavist–D does not fall within the scope of Subsection A. Plaintiff is mistaken, for even assuming it is true that FDA approval can occur only though publication, the 1999 edition of the FDA's official publication, *Approved Drug Prod-*

---

1. Throughout this Order, the Court will refer to Sandoz and NCH interchangeably.

*ucts With Therapeutic Equivalence Evaluation,* commonly known as the *Orange Book,* lists Tavist–D as an FDA-approved product. (Def.'s Statement of Facts, Ex. 13.) In order to be included in the *Orange Book,* a drug must be "the subject of an application with an effective approval that has not been withdrawn for safety and efficacy reasons." (Def.'s Statement of Facts, Ex. 13.) Accordingly, Tavist–D meets the requirements of Subsection A.

### 2. A.R.S. § 12–701(B)

Next, Defendant contends that Subsection B, which removes Subsection A's shield of immunity from punitive damages for drug manufacturers who procured FDA approval through fraud, is unconstitutional, for it conflicts with the Federal Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq.* (1994 ed. and Supp. V), and is therefore impliedly preempted under the Supremacy Clause of the United States Constitution. The primary authority Defendant relies on is the United States Supreme Court's decision in *Buckman v. Plaintiffs' Legal Committee,* where the Court held that the FDCA, as amended by the Medical Device Amendments of 1976 ("MDA"), 21 U.S.C. § 301, *et seq.* (1994 ed. and Supp. V), impliedly preempted the plaintiff's state law fraud-on-the-FDA claim. 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001).

#### a. Supremacy Clause

The Supremacy Clause provides that "[t]he Constitution and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The effect of the Supremacy Clause is to invalidate state laws that "interfere with, or are contrary to" federal law. *Hillsborough v. Automated Med. Labs.,* 471 U.S. 707, 712–13, 105 S.Ct. 2371, 2374–75, 85 L.Ed.2d 714 (1985) (quoting *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1,

211, 6 L.Ed. 23 (1824)). In determining whether federal law preempts state law, a court's "sole task is to ascertain the intent of Congress." *Cal. Fed. Savings & Loan Ass'n v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). If Congress says expressly that it wishes to preempt state law, "that is the end of the matter." *Keams v. Tempe Technical Inst.,* 39 F.3d 222, 225 (9th Cir.1994). If Congress does not make its intent known expressly, courts may infer it. State laws are preempted if it appears that Congress "intended to occupy the entire field, leaving no room for the operation of state law". Even if that is not so, [courts] infer preemption ... if compliance with both state and federal law would be impossible, or state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quoting *California v. ARC Am. Corp.,* 490 U.S. 93, 100–01, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989)).

#### b. *Buckman v. Plaintiffs' Legal Committee*

In *Buckman,* the plaintiff sued the manufacturer of allegedly defective orthopedic bone screws under state tort law for making fraudulent representations to the FDA. *Buckman,* 531 U.S. at 343–44, 121 S.Ct. at 1015. Under the plaintiff's theory, had the defendant, a regulatory consultant retained by the manufacturer of the bone screws, not misrepresented certain material facts to the FDA, the FDA would not have approved the screws, and the plaintiff would not have been injured. *Id.* at 343, 121 S.Ct. at 1015. The Court held that the FDCA, as amended by the MDA, impliedly preempted the fraud-on-the-FDA claim. *Id.* at 348, 121 S.Ct. at 1017.

The first step in the *Buckman* Court's analysis was to decide whether to invoke the presumption against preemption, a

presumption that exists out of deference to the "historic police powers of the States," particularly in matters of health and safety. *Id.* at 348, 121 S.Ct. at 1017; *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 2255, 135 L.Ed.2d 700 (1996) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). The Court opted against the presumption, as "[p]olicing fraud against federal agencies is hardly 'a field which the States have traditionally occupied.' " *Buckman,* 531 U.S. at 347, 121 S.Ct. at 1017 (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1146). Instead, "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law." *Buckman,* 531 U.S. at 347, 121 S.Ct. at 1017.

Next, the Court turned to the question of preemption. It noted that "the federal statutory scheme amply empowers the FDA to punish and deter fraud against the Administration." *Id.* at 348, 121 S.Ct. at 1017. For example, the FDA has the power to require additional information from companies seeking approval of medical devices, 21 C.F.R. § 807.87(f) (2000), to investigate suspected fraud, 21 U.S.C. § 372 (2000); 21 C.F.R. § 5.35 (2000), to seek injunctive relief, 21 U.S.C. § 332 (1993), and civil penalties, 21 U.S.C. § 333(f)(1)(A) (2000), to pursue criminal prosecutions, 21 U.S.C. § 333(a) (2000), and to seize the medical device, 21 U.S.C. § 334(a)(2)(D) (1997). *Id.* at 349, 121 S.Ct. at 1018.

The Court reasoned that the FDA employs these tools "to achieve a somewhat delicate balance of statutory objectives [that] ... can be skewed by allowing fraud-on-the-FDA claims under state tort law." *Id.* at 349, 121 S.Ct. at 1017. One way that fraud-on-the-FDA claims would skew this "delicate balance" would be to "dramatically increase the burden facing potential applicants," by, among other things, causing applicants "to fear that their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court." *Id.* at 351, 121 S.Ct. at 1019. Applicants would then likely "submit a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application." *Id.* at 351, 121 S.Ct. at 1019. These delays would, in turn, significantly slow the approval process, keeping potentially helpful medical devices from the public for unnecessarily long periods. *Id.* at 351, 121 S.Ct. at 1019. The Court also noted that, in lieu of private rights of action against the FDA, nothing prevents citizens from "report[ing] wrongdoing and petition[ing] the agency to take action." *Id.* at 349; 121 S.Ct. at 1018.

It is also important to note the way in which the Court distinguished the case before it from *Medtronic,* 518 U.S. at 470, 116 S.Ct. at 2243. In *Medtronic,* which involved an allegedly defective pacemaker, the Court held that the MDA did not expressly preempt the plaintiff's common law design, manufacturing and labeling claims. The Court stated that "the *Medtronic* claims arose from the manufacturer's alleged failure to use reasonable care in the production of the product, not solely from the violation of the FDCA requirements." *Buckman,* 531 U.S. at 352, 121 S.Ct. at 1020. In contrast, the fraud claim in *Buckman* "exists solely by virtue of the FDCA disclosure requirements." *Id.* at 352, 121 S.Ct. at 1020. In other words, "were plaintiffs to maintain their fraud-on-the-agency claims here, they would not be relying on traditional state tort law which had predated the federal enactments in questions. On the contrary, the existence of these federal enactments is a critical element of their case." *Id.* at 353, 121 S.Ct. at 1020.

### c. Lower Court Interpretation of *Buckman*

Lower courts have applied *Buckman*'s reasoning to other federal statutory schemes. In *Nathan Kimmel, Inc. v. DowElanco,* 275 F.3d 1199 (9th Cir.2002), the basis of the plaintiff's state law claim for intentional interference with a prospective economic advantage was that the defendant knowingly submitted false information to the Environmental Protection Agency ("EPA") to obtain a particular label for a bag manufactured to hold an EPA-regulated pesticide.. The Ninth Circuit found that, in light of *Buckman,* the plaintiff's state law claim was preempted by the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136–136y (1996), a "comprehensive regulatory scheme aimed at controlling the use, sale, and labeling of pesticides." *DowElanco,* 275 F.3d at 1203. The court observed that, like the MDA, FIFRA empowered the EPA to deter and punish fraud using particular methods designed to "achieve a somewhat delicate balance of statutory objectives." *Id.* at 1206 (quoting *Buckman,* 531 U.S. at 348, 121 S.Ct. at 1017). Like the *Buckman* Court, the *DowElanco* court held that the allowance of state law fraud-on-the-EPA claims would impede the EPA's ability carry out its statutory objectives. *Id.* at 1206. Other courts have followed a similar analysis. *See Morgan v. Brush Wellman, Inc.,* 165 F.Supp.2d 704, 722 (E.D.Tenn.2001) (holding that, under *Buckman,* United States Department of Energy ("DOE") regulations impliedly preempted the plaintiff's state law civil conspiracy claim, where allowing the claim to proceed would "conflict[ ] with the DOE's ability to set nuclear policy consistent with its own judgment and objectives"); *McCall v. PacifiCare of Cal., Inc.,* 25 Cal.4th 412, 106 Cal.Rptr.2d 271, 21 P.3d 1189, 1199 n. 9 (2001) ("To the extent the [plaintiff's] complaint alleges fraud on the [Health Care Financing Ad-

ministration], defendants may, on remand, assert it is preempted under the rule in *Buckman.*"); *Andrx Pharms. v. Biovail Corp.,* 175 F.Supp.2d 1362, 1369–70 (S.D.Fla.2001) (holding that, under *Buckman,* the plaintiff's claims for deceptive and unfair practices, tortious interference with business relationships and negligence per se were impliedly preempted by the Hatch–Waxman Act in the FDCA because all of these claims necessarily rely on the Act's patent listing requirements).

Courts have also extended *Buckman*'s logic to the federal statutory scheme that governs the new drug approval process. In *Flynn v. American Home Products Corporation,* 627 N.W.2d 342 (Minn.Ct. App.2001), the court held that, in light of *Buckman,* the FDCA impliedly preempted the plaintiff's state law fraud-on-the-FDA claim, which alleged that but-for fraudulent misrepresentations made by fenphen's manufacturer during its approval process, the drug never would have been approved, and consequently, the plaintiff never would have been injured. The court noted the similarities between the regulatory schemes that govern the approval of drugs and medical devices. *Id.* at 349, 121 S.Ct. 1012. Due to these similarities, subjecting drug manufacturers to the "50 States' tort regimes" would likely have a disruptive effect on the FDA's authority "to consistently police fraud within the agency's powers." *Id.* (quoting *Buckman,* 531 U.S. at 348, 121 S.Ct. at 1018); *see Garcia v. Wyeth–Ayerst Labs.,* 385 F.3d 961 (6th Cir.2004).

### d. Applicability of *Buckman* to A.R.S. § 12–701(B)

The issue in the present case is whether, under *Buckman,* the Arizona law that immunizes the manufacturer and seller of an FDA-approved drug from punitive damage liability, unless the plaintiff can show that fraudulent misrepresentation to the FDA

marred the drug approval process, conflicts with, and is therefore impliedly preempted by, the provisions of the FDCA that regulate the drug approval process. This issue is slightly different than that which confronted the Court in *Buckman.* In *Buckman,* the plaintiffs' theory of liability was that but-for the defendant's fraudulent statements to the FDA, the bone screws would have never received FDA approval, and the plaintiffs would not have been injured. The present case, in contrast, does not involve a claim of fraud-on-the-FDA but instead involves a state statute which immunizes drug manufacturers from punitive damages liability *unless* the plaintiff can prove fraud on the FDA.

This is an issue that only one other court appears to have addressed. In *Garcia v. Wyeth–Ayerst Laboratories,* the plaintiff brought a products liability action against a drug manufacturer and sought; among other things, punitive damages. 385 F.3d at 961. Michigan, like Arizona, immunizes drug manufacturers from punitive damage liability in actions based on injuries from FDA-approved drugs. *Id.* at 966; Mich. Comp. Laws § 600.2946(5) (1996). Like Arizona, Michigan's law does not extend immunity to drug manufacturers who secured FDA approval through fraud. *Id.* The Sixth Circuit commenced its analysis by noting a difference between the case before it and the case that was before the Court in *Buckman.* Whereas *Buckman* involved a specific cause of action for fraud on the FDA, the plaintiff in *Garcia* had to prove fraud on the FDA merely as a prerequisite to obtaining punitive damages under Michigan law. *Id.* at 965–66. The court in *Garcia* deemed this difference "immaterial" in light of *Buckman,* endorsing the District Court's view that "state tort remedies requiring proof of fraud committed against the FDA are foreclosed since federal law preempts such claims." *Id.* at 966 (quoting *Garcia v. Wyeth–Ayerst Labs.,* 265 F.Supp.2d 825, 832

(E.D.Mich.2003)). The reason that this difference was immaterial to the *Garcia* court is that regardless of whether a plaintiff is required to prove fraud on the FDA as a cause of action unto itself or simply as a prerequisite in a punitive damages action, "[s]uch a state court proceeding would raise the same inter-branch-meddling concerns that animated *Buckman.*" *Id.* at 966 (citing *Buckman,* 531 U.S. at 351, 121 S.Ct. at 1012). In light of this rationale, the court found that the Michigan law did not conflict with the FDCA as long as the proof of fraud-on-the FDA element was satisfied only by a finding by the FDA itself that it had been defrauded. *Id.* at 966.

Plaintiff asserts that her case is readily distinguishable from *Buckman.* According to Plaintiff, a key element of the *Buckman* plaintiffs' claim was that but-for the defendants' misrepresentations, the FDA would not have approved the bone screws and the plaintiff would not have been injured. This causation element played such a crucial role, Plaintiff maintains, because it forced state courts to place themselves in the shoes of the FDA, and render an opinion as to whether the FDA would have acted differently had it been in possession of the information that the manufacturer allegedly withheld during the approval process. In contrast, Arizona's immunity law does not, according to Plaintiff, compel a court to substitute its judgment for that of the FDA. Subsection B merely requires a plaintiff to prove that the drug manufacturer withheld "material and relevant" information from the FDA during the approval process.

■ The Court is not persuaded by the distinction Plaintiff seeks to draw between a "material" piece of information and one that would have caused the FDA to act differently. Even assuming that there is a semantic difference between those terms,

the rationale that led the *Buckman* court to find implied preemption applies with equal force in the present case. Both a common law fraud-on-the-FDA claim and an immunity statute that requires a plaintiff to prove fraud on the FDA in order to collect punitive damages place state courts, as finders of fact, in the uncomfortable and difficult position of having to answer the question of what role, if any, the allegedly withheld information would have played in the FDA's complicated approval process. Further, the potentially deleterious effects that could flow from *Buckman* fraud-on-the-FDA claims could also occur in the context of Arizona's immunity law. Drug manufacturers, like medical device manufacturers, could reasonably fear that "their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court." *Buckman*, 531 U.S. at 351, 121 S.Ct. at 1019. Like medical device manufacturers, drug manufacturers may address this eventuality by "submit[ting] a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application." *Id.* at 351, 121 S.Ct. at 1019. One inevitable consequence of bogging down the application process would be to delay the public's access to a particular drug. *See id.* at 351, 121 S.Ct. at 1019. Finally, the FDA is equally empowered to police and deter fraud with respect to the drug approval process as it is with the medical device approval process. In both contexts, the FDA has the authority to request additional information from a drug manufacturer, investigate suspected fraud, seek injunctive relief and civil penalties and pursue criminal prosecutions.

To be sure, there are significant aspects of the *Buckman* court's rationale that are not transferable to the context of the drug approval process. The *Buckman* Court expended considerable time discussing the negative effect that fraud-on-the-FDA claims would have on the "off-label" usage of medical devices, a practice in which a device is employed for some other purpose than that for which it has been approved by the FDA.[2] *Buckman*, 531 U.S. at 350, 121 S.Ct. at 1018. Federal law protects a doctor's right to "prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." *Id.* at 350, 121 S.Ct. at 1018 (quoting 21 U.S.C. § 396 (1994 ed., Supp. V)). The *Buckman* Court worried that allowing fraud-on-the-FDA suits would discourage "[w]ould-be applicants ... from seeking ... approval of devices with potentially beneficial off-label uses for fear that such use might expose the manufacturer ... to unpredictable civil liability." *Id.* at 350, 121 S.Ct. at 1018. The effect, in other words, would be to encroach upon a health care professional's ability to practice medicine, an ability which the FDCA expressly preserves. *Id.* at 350, 121 S.Ct. at 1018 (citing 21 U.S.C. § 396 (1994 ed., Supp. V)).

While the practice of off-label usage has no analog in the context of drug manufacturing, the other concerns that the *Buckman* Court enunciated, such as the inherent difficulty in allowing state courts to substitute their judgment for that of the

**2.** For example, the bone screw manufacturer in *Buckman* twice sought, and was twice denied, FDA approval to use its bone screws in spinal surgery. *Buckman*, 531 U.S. at 346, 121 S.Ct. at 1016. The company's third application, which was successful, classified the screws for use in the long bones of the arms and legs. *Id.* at 350, 121 S.Ct. at 1018. Health care professionals began to use the screws in an "off-label" manner, implanting them in the spines of their patients, many of whom were injured as a result, and sued the manufacturer.

FDA and the dilatory effect of encouraging manufacturers to submit a "deluge" of information to the FDA, apply with equal, if not greater force, to the context of the drug approval process. As with medical devices, the public suffers when the FDA approval process is unnecessarily prolonged. As with medical devices, the public is adversely impacted when manufacturers are discouraged from seeking FDA approval of products out of fear of the inherent difficulty of complying with the "50 States' tort regimes." *Id.* at 350, 121 S.Ct. at 1018. As with medical devices, when the costs of development and FDA approval increase, so does the ultimate price of the product.

Indeed, as discussed above, the absence of the off-label usage rationale notwithstanding, courts have readily applied the reasoning of *Buckman* to other statutory schemes, including the drug approval process, and found preemption of state law claims when an essential element of those claims was fraud on the FDA. *See Flynn*, 627 N.W.2d at 342 (applying *Buckman* in the FDA drug approval context); *Morgan*, 165 F.Supp.2d at 722 (finding that, under *Buckman*, DOE regulations preempt the plaintiff's state law civil conspiracy claim); *McCall*, 106 Cal.Rptr.2d 271, 21 P.3d at 1199 n. 9 (suggesting that, under *Buckman*, the Medicare Act may preempt the plaintiff's fraud-on-the-Health Care Financing Administration claim); *Andrx Pharms.*, 175 F.Supp.2d at 1369–70 (holding that, under *Buckman*, the Hatch–Waxman Act in the FDCA preempts the plaintiff's claims for deceptive and unfair practices, tortious interference with business relationships and negligence per se). Indeed, in every case where a court has analyzed whether a federal regulatory scheme preempts state law claims that require a plaintiff to prove as an essential element fraud on the federal agency responsible for administering the federal scheme, the court has found preemption of the state law claim.

Plaintiff nonetheless argues that "*Buckman* has been repeatedly interpreted narrowly and held not to preempt state law claims." (Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. at 14) (citing *Eve v. Sandoz Pharm. Corp.*, 2002 WL 181972 (S.D.Ind. Jan.28, 2002); *Caraker v. Sandoz Pharm. Corp.*, 172 F.Supp.2d 1018 (S.D.Ill. 2001); *Dawson ex rel. Thompson v. Ciba–Geigy Corp., USA*, 145 F.Supp.2d 565 (D.N.J.2001); *Bryant v. Hoffmann–La Roche, Inc.*, 262 Ga.App. 401, 585 S.E.2d 723 (2003)). However, none of the cases cited by Plaintiff involved torts containing proof of fraud on a federal agency as an essential element or prerequisite. For example, in *Caraker v. Sandoz Pharmaceuticals Corporation*, the court held that *Buckman* did not compel preemption of a state law failure to warn claim. *Caraker*, 172 F.Supp.2d at 1039. The court stated, "[i]n *Buckman*, the plaintiffs' claim was a 'fraud-on-the-FDA' cause of action, one essential element of which was that the FDA was defrauded.... Here, the Carakers are not asserting fraud on the FDA claims, and a finding of a specific violation of the FDCA is not a necessary element of any of the Carakers' torts." *Id.*

Satisfied that *Buckman's* rationale applies in the present context, the Court next considers the effect of that application. It is clear that, in light of *Buckman*, the portion of A.R.S. § 12–701 that requires proof of fraud on the FDA is unconstitutional in certain circumstances, as it conflicts with the federal law. While the Court agrees with *Garcia* that no preemption need occur where the FDA has made a finding that it has been defrauded, *Garcia*, 385 F.3d at 966 ("It makes abundant sense to allow a State that chooses to incorporate a federal standard into its law of torts to allow that standard to apply

when the federal agency itself determines that fraud marred the regulatory approval process."); *see also Buckman,* 531 U.S. at 354, 121 S.Ct. at 1020 (Stevens, J., concurring) ("If the FDA determines both that fraud has occurred and that such fraud requires the removal of a products from the market, state damages remedies would not encroach upon, but rather would supplement and facilitate, the federal enforcement scheme."), that is not the case here.

### e. Severability of A.R.S. § 12–701(B)

Faced with an unconstitutional statutory provision, the Court is left with the question of whether to declare as unconstitutional the entirety of A.R.S. § 12–701, or to sever the unconstitutional provision and enforce the remainder of the statute. The *Garcia* court aptly described this conundrum: "The question, accordingly, is whether the Michigan legislature would have preferred the situation where drug manufacturers would enjoy immunity in the absence of a federal finding of bribery or fraud on the FDA, or the situation urged by the Plaintiff where drug manufacturers would enjoy no immunity at all." *Id.* at 967.

In determining whether Subsection B may be severed from the remainder of the statute, the primary concern is the intent of the legislature. *Selective Life Ins. Co. v. Equitable Life Assur. Soc. of U.S.,* 101 Ariz. 594, 600, 422 P.2d 710 (Ariz.1967) (citing *City of Mesa v. Killingsworth,* 96 Ariz. 290, 394 P.2d 410 (Ariz. 1964)). Further, it is settled in Arizona that "where the valid parts of statute are effective and enforceable standing alone and independent of those portions declared unconstitutional, the court will not disturb the valid law if the valid and invalid portions are not so intimately connected as to raise the presumption the legislature would not have enacted one without the other, and the invalid portion was not the inducement of the act." *Selective Life Ins.*

*Co.,* 101 Ariz. at 600, 422 P.2d 710 (citing *McCune v. City of Phoenix,* 83 Ariz. 98, 100, 317 P.2d 537 (Ariz.1957)).

*Garcia* is the only case that has discussed the severability of a statute that shields drug manufacturers from punitive damage liability unless the plaintiff proves fraud on the FDA. The court found that the offending provision was severable, owing to the Michigan legislature's concern that punitive damage liability for drug companies harms the financial viability of those companies, increases the cost of new drugs and delays the public's access to those drugs. *Garcia,* 385 F.3d at 967. As to the argument that a finding of severability would be tantamount to encouraging drug companies to defraud the FDA, the *Garcia* court reasoned that such a finding "will merely place responsibility for prosecuting bribery or fraud on the FDA in the hands of the Federal Government rather than state courts." *Id.*

First, Subsection A, the portion of A.R.S. 12–701 that grants immunity to the manufacturers and sellers of FDA-approved drugs, is clearly "effective and enforceable standing alone and independent of those portions declared unconstitutional." *Selective Life Ins. Co.,* 101 Ariz. at 600, 422 P.2d 710 (citing *McCune,* 83 Ariz. at 100, 317 P.2d 537). As in Michigan, with the unconstitutional provision removed, drug manufacturers in Arizona would be immune from punitive damage liability unless the FDA made a finding that the drug manufacturer had committed fraud during the approval process. This solution would make enforcement of the statute far easier, as it would eliminate the inherently unreliable practice of requiring a fact finder to render an opinion as to what effect a particular piece of information would have had on the FDA's decision to approve a new drug. In addition, there are compelling reasons to immunize the

sellers and manufacturers of FDA-approved drugs from punitive damage liability in the absence of an FDA finding of fraud. As discussed above, such reasons include the chilling effect that punitive damages can have on the development of new drugs, the delay that punitive damages can potentially cause in new drugs becoming publicly available, and the increased cost to the public of those drugs once they become publicly available. *See generally* Annette L. Marthaler, *The FDA Defense: A Prescription for Easing the Pain of Punitive Damage Awards in Medical Products Liability Cases,* 19 Hamline L.Rev. 451 (1996); Bruce N. Kuhlik & Richard F. Kingham, *The Adverse Effects of Standardless Punitive Damage Awards on Pharmaceutical Development and Availability,* 45 Food Drug Cosm. L.J. (1990).

Next, the Court must determine whether the invalid provision of A.R.S. § 12–701 is "so intimately connected" with the remainder of the statute "as to raise the presumption that the legislature would not have enacted one without the other, and the invalid portion was not the inducement of the act." *Selective Life Ins. Co.,* 101 Ariz. at 600, 422 P.2d 710 (citing *McCune,* 83 Ariz. at 98, 317 P.2d 537). Plaintiff appears to argue that the entire statute should be invalidated because "[i]t is unfathomable [that] the Arizona Legislature would foreclose Arizona residents from punishing a drug manufacturer for false representations in its label." (Pl.'s Resp. to Def.'s Mot. for Partial Summ. J. at 15.)

Plaintiff's argument is unavailing. Regardless of whether all of the statute or part of the statute is invalidated, a plaintiff in Arizona will still be able to obtain punitive damages against a drug manufacturer. If the entire statute is unconstitutional, a plaintiff must still establish by clear and convincing evidence under standard punitive damage law that the defendant has engaged in "outwardly aggravated, outrageous, malicious or fraudulent conduct," with either the specific "intent to injure or defraud" the plaintiff, or with "conscious disregard of the probability of some injury or damage to the rights and interests of others." *White v. Mitchell,* 157 Ariz. 523, 529, 759 P.2d 1327 (1988) (quoting *Gurule v. Ill. Mutual Life and Cas. Co.,* 152 Ariz. 600, 602, 734 P.2d 85 (Ariz.1987)); *see Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 330, 723 P.2d 675 (Ariz.1986); *Rawlings v. Apodaca,* 151 Ariz. 149, 162, 726 P.2d 565 (Ariz.1986). If Subsection B is severed from the rest of the statute, a plaintiff may still obtain punitive damages, so long as the FDA has made a finding that it has been defrauded by the drug manufacturer. In this circumstance, the burden of policing fraud on the FDA is placed exclusively in the hands of the FDA.

The Court acknowledges that, as Plaintiff points out, punitive damages play an important role in punishing and deterring wrongful conduct. *See generally Medasys Acquisition Corp. v. SDMS, P.C.,* 203 Ariz. 420, 55 P.3d 763 (Ariz.2002); *Wyatt v. Wehmueller,* 167 Ariz. 281, 285, 806 P.2d 870 (Ariz.1991); *Bryant v. Silverman,* 146 Ariz. 41, 47, 703 P.2d 1190 (Ariz.1985). In light of this role, if severing Subsection B foreclosed entirely the possibility of an injured plaintiff obtaining punitive damages against a drug manufacturer who defrauded the FDA, there would be a more powerful argument that Subsection B should not be severed from the rest of the statute. However, a finding that the provisions are severable still leaves open the possibility of punitive damages. Such a finding, as mentioned above, simply shifts the burden of determining whether the FDA was defrauded to the FDA. As such, the Court finds that Subsection B should be severed from the remainder of the statute.

Plaintiff summarily argues that if the Court were to sever Subsection B from the remainder of A.R.S. § 12–701, there would be a "serious question" about whether A.R.S. § 12–701 would pass muster under a provision of the Arizona Constitution which provides:

No law shall be enacted granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations.

Ariz. Const. art. II, § 13.

Plaintiff argues that if Subsection B were severed, the remainder of A.R.S. § 12–701 would improperly grant immunity to drug companies that is not enjoyed by "all citizens or corporations." Plaintiff is mistaken, as the plain terms of Subsection A provide immunity to *all* Arizona companies who choose to sell FDA-approved drugs. If the statute immunized some companies who sold FDA-approved drugs but not others, there is a risk that the statute would run afoul of the Arizona Constitution, but that is far from the case with Subsection A.

■ Therefore, Defendant's motion for partial summary judgment on the issue of punitive damages must be granted, as Defendant has satisfied the only remaining part of the statute, Subsection A, which requires either that Tavist–D be FDA-approved or that it is "generally recognized as safe and effective pursuant to conditions established" by the FDA. A.R.S. § 12–701(A)(1998).

## III. CONCLUSION

Defendant's motion for partial summary judgment on the issue of punitive damages is granted. Tavist–D, the drug manufactured by Defendant that Plaintiff alleges caused her injuries, satisfies the requirements of Subsection A, as the FDA approved the drug on five occasions, each time pronouncing it "safe and effective." Subsection B is unconstitutional as applied to this case as its requirement that a plaintiff prove fraud on the FDA is impliedly preempted by federal law. However, because Subsection B is severable from the remaining sections of the statute, Defendant is immune from punitive damage liability solely by virtue of the fact that Tavist–D complies with the provisions of Subsection A.

**IT IS ORDERED** granting Defendant's motion for partial summary judgment on the issue of punitive damages (Doc. 185).