748 P.2d 1191

**Sharon VOLZ and Valley National Bank, as co-conservators for and on behalf of Shannon Haddix, a Protected Minor, Plaintiffs/Appellees,**

v.

**The COLEMAN COMPANY, INC., Defendant/Appellant.**

**No. CV 86-0321-PR.**

Supreme Court of Arizona, In Banc.

Dec. 17, 1987.

---

Richard D. Grand, Tucson, for plaintiffs/appellees.

Lewis and Roca by Douglas L. Irish, Susan M. Freeman and Stephen M. Bressler, Phoenix, Kimble, Gothreau, Nelson & Cannon by Stephen Kimble, Tucson, for defendant/appellant.

CAMERON, Justice.

## I. JURISDICTION

This is a petition for review, filed by The Coleman Co., Inc. (Coleman), of an opinion of the court of appeals which affirmed a trial court judgment and award in favor of the respondents Sharon Volz and Valley National Bank, co-conservators for the plaintiff, Shannon Haddix. *Volz v. The Coleman Co., Inc.,* 155 Ariz. 563, 748 P.2d 1187 [1986]. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), A.R.S. § 12–120.24 and Ariz.R.Civ.App.P. 23, 17A A.R.S.

## II. QUESTION PRESENTED

We granted the petition for review to consider whether punitive damages were properly awarded pursuant to our holding in *Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565 (1986), and *Linthicum v. Nationwide Life Insurance Co.,* 150 Ariz. 326, 723 P.2d 675 (1986).

## III. FACTS

On 15 August 1983, while camping with her family, five-year-old Shannon Haddix (plaintiff) was severely burned by ignited gasoline. Her stepfather, Ron Volz, was pumping the fuel tank on his Coleman stove when, according to his testimony, a stream of fuel, without warning, ejected through the filler cap, crossed the campfire, ignited, and landed on Shannon, some 10–12 feet away. Volz testified that, after refueling the tank, he had screwed the cap on tightly before pressurizing the tank for the morning meal. He added that he did not pour any more fuel into the tank for the evening meal, and that he had checked the cap to make sure that it was tight before pumping the tank in the evening. Volz testified that because the pump was "pretty stiff" after only three to six pumps, he knew that the tank had retained pressure from the morning use.

The plaintiff presented expert testimony concerning the design of the cap and alternative cap designs that Coleman could have utilized. John B. Sevart, an engineer with a private consulting practice and with two engineering companies, testified that, in his opinion, the design of a gas tank using a cap with a vent-hole is defective with respect to safety. Kenneth John Saczalski, a professor of engineering at Northern Arizona University and the owner of a private consulting company, testified that there were alternative cap designs that Coleman

could have utilized to accomplish ventilation of the tank without the cap having any of the vent-hole characteristics.

Coleman has manufactured camp stoves for over forty-five years. During this time, Coleman has introduced 25–50 million stoves into the marketplace. From the early 1940s through 1963, Coleman equipped its camp stoves with a vent-hole filler cap used in this case. This same cap was used on fuel-burning lanterns also manufactured by Coleman.

In using the Coleman stove, the fuel must be pressurized so that it will flow from the tank to the burner. Pressurization is accomplished by pumping the sealed tank until the plunger handle becomes resistant. To refuel a Coleman tank, the cap on the end of the tank opposite the plunger handle is unscrewed and removed. The cap, however, needs to have some type of ventilation capacity in order to equalize the interior pressure of the tank with that of the exterior atmosphere as the cap is removed. If the cap is without a ventilation feature, then removal of the cap will create a sudden pressure surge causing a discharge of fuel in a stream-like manner.

In 1963, the vent-hole filler cap for use in the stove was discontinued by Coleman and was replaced with a cap referred to as the "Plamann patent." The Plamann patent cap, because it is internally broached, directs any type of pressurized discharge from the tank in a downward direction, rather than in an outward direction as in the vent-hole filler cap. In 1963, however, several hundred thousand stoves were already in the marketplace equipped with the vent-hole filler cap. The Volz's received the stove in question as a Christmas gift in 1982. The stove, however, contained the old cap and not the newer "Plamann Patent" cap.[1] Coleman never issued warnings

to users about the old caps nor did it recall any of the stoves or lanterns containing these caps.

A 1963 internal Coleman document and a 1967 patent application were introduced into evidence that discussed the defects in the vent-hole filler cap and improvements that would be gained by redesigning the venting system. However, Coleman employees, both engineers and management-level, repeatedly testified that no warning on the use of Coleman fuel in the tank and stove was necessary because "common sense" would indicate to a person that the "hazardous substance" of the Coleman fuel should not be used in such a way that a stream would be emitted from the tank. These employees also testified that Coleman redesigned the original cap into the "Plamann patent" cap because it was more functional to use and economical to produce, and *not* because of safety reasons. Indeed, testimony was introduced at trial indicating that there was no safety advantage to the "Plamann patent" cap when compared to the vent-hole filler cap.

The 1963 Coleman internal memorandum stated: "[b]ecause, under many circumstances the gasoline ... tends to foam when the pressure is relieved, ... [such] gasoline froth [can blow] out through this vent hole." Furthermore, the memo stated that it was not possible to control the direction in which the stream traveled.

Additionally, the testimony of Coleman employees Randy May, director of technical services, William Marsh, director of design engineering for the outgoing products division, Jerry Koontz, national service manager, and William Townsend, a technical research engineer, indicated that Coleman had notice since 1960 of the tendency of the cap to spray fuel. However, Coleman's

1. The exact date of manufacture of the Coleman stove in issue is unknown. Randy May, Coleman's director of technical services, said the component part of the stove was manufactured somewhere between 1956 and 1959. The tank was a replacement tank that fit on old models. May said the tank and the pump were manufactured in 1981. Wilbur Townsend, a retired Coleman technical research engineer, was unable to say when the stove was manufactured.

He did not believe it could have been manufactured in the 1970s because in the '70s, Coleman used a larger diameter valve wheel. The vent-hole filler cap was replaced by the broached cap in the early 1960s. However, the vent-hole filler caps were put on the stoves until they were used up. Townsend doubted that any stoves manufactured in the late 1970s or early 1980s would have had that type of cap.

head of outgoing products division, Elwood Little, did not believe it was hazardous to loosen the cap and believed the instructions were clear that the tank needed to be kept level. Koontz testified that fuel sprayed only if the tank was not level and the cap was loose. He also testified that if the stove were operated in the proper manner a person could not "pump enough pressure into it to shoot fuel 12 feet."

Despite Coleman's knowledge of the possibility of fuel spraying through the vent hole of the filler cap, no warnings were issued advising the user not to open the cap except when the tank was level and not near a flame. Coleman's design project manager, Frank Schmidt, testified that there were no instructions on how to relieve pressure from the tank. Relieving pressure would prevent the possibility of fuel spraying out if the tank were not level or if the cap were loose. Testimony of other Coleman employees emphasized that Coleman only had notice of fuel spraying when the cap was unscrewed. In the present case, Volz testified that he had not unscrewed the cap and that the fuel was released "spontaneously."

The jury awarded plaintiff $6.8 million in compensatory damages and $1.06 million in punitive damages. The defendant appealed and the court of appeals affirmed the awards. Defendant petitioned this court for review. We granted the petition only on the issue of punitive damages.

## IV. PUNITIVE DAMAGES

■ In both its motion for a new trial and on appeal, Coleman contends that it was error for the trial court to give a punitive damages instruction. We agree.

■ Punitive damages are awarded in order to punish the wrongdoer and deter others from emulating the same conduct. *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 330, 723 P.2d 675, 679 (1986). The focus is on the wrongdoer's attitude and conduct. *Id.; Rawlings v. Apodaca*, 151 Ariz. 149, 726 P.2d 565 (1986). The punitive damages standard in Arizona requires "something more" than gross negligence. *Rawlings*, 151 Ariz. at 161, 726

P.2d at 577. The "something more" is the evil mind, which is satisfied by evidence "that defendant's wrongful conduct was motivated by spite, actual malice, or intent to defraud" or defendant's "conscious and deliberate disregard of the interest and rights of others." *Gurule v. Illinois Mut. Life and Casualty Co.*, 152 Ariz. 600, 602, 734 P.2d 85, 87 (1987).

■ To obtain punitive damages, a plaintiff must prove that "defendant's evil hand was guided by an evil mind." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. This "evil mind" element may be shown by either 1) evil actions; 2) spiteful motives; or 3) outrageous, oppressive or intolerable conduct that creates substantial risk of tremendous harm to others. *Linthicum*, 150 Ariz. at 330, 723 P.2d at 679; *Gurule*, 152 Ariz. at 602, 734 P.2d at 87. The fact that a manufacturer continues to market a product is not in itself enough to show the evil mind necessary for punitive damages. *See Bhagvandoss v. Beiersdorf*, 723 S.W.2d 392, 398 (Mo.1987).

This court has expressly rejected awarding punitive damages based on gross negligence or mere reckless disregard of the circumstances. *Linthicum*, 150 Ariz. at 331, 723 P.2d at 680; *Gurule*, 152 Ariz. at 603, 734 P.2d at 88. We have stated that such terms as "gross," "reckless," and "wanton conduct" "convey little and fail to focus the jury's attention on the important question—the defendant's motives." *Gurule*, 152 Ariz. at 602, 734 P.2d at 87.

As one court has noted:

> It is quite clear, we think, from the evidence, that the jury could well have found negligence or even gross negligence on the part of this defendant. But negligent conduct, no matter how gross or wanton, cannot be equated with the conduct required for punitive damages. We hold, therefore, that plaintiff's evidence in this case was insufficient as a matter of law to demonstrate that type of "outrageous conduct" on which an award of punitive damages must depend.

*Thomas v. American Cystoscope Makers, Inc.*, 414 F.Supp. 255, 267 (E.D.Pa.1976)

(applying Pennsylvania law in a products liability action).

This is a case of negligence, or even gross negligence, and the jury so found in awarding compensatory damages. It is not, however, a case of punitive damages or the "something more" than gross negligence required by *Linthicum* and *Rawlings*. An instruction for punitive damages was not justified.

## V. DISPOSITION

In *Linthicum*, we established a burden of proof for punitive damages by clear and convincing evidence rather than by a preponderance of the evidence. *Linthicum* was decided after the trial in this case. We have held:

> Under these circumstances, we hold that the new burden of proof shall be given only prospective application. After September 15, 1986, the date *Linthicum* was mandated, punitive damages are recoverable only upon clear and convincing evidence of a defendant's evil mind.
>
> The new burden of proof shall not apply where a verdict or judgment based upon proof by a preponderance of the evidence has been entered and where there is no reason to require a new trial other than application of the new burden of proof.

*Hawkins v. Allstate Insurance Co.*, 152 Ariz. 490, 505, 733 P.2d 1073, 1088 (1987). *See Gurule v. Illinois Mut. Life and Casualty Co.*, 152 Ariz. 600, 603 n. 3, 734 P.2d 85, 88 n. 3 (1987) ("At any rate, the distinction between preponderance of the evidence and clear and convincing evidence is unimportant here because we find the evidence insufficient to meet even the preponderance threshold.")

Since we find that there was insufficient evidence to support an award of punitive damages by either burden of proof, we need not consider the retroactivity of the requirement that punitive damages must be found by clear and convincing evidence as opposed to the lesser preponderance of the evidence rules.

The award of punitive damages is reversed and set aside. The judgment as amended is affirmed.

GORDON, C.J., FELDMAN, V.C.J., and HOLOHAN, J., concur.

NOTE: Justice JAMES MOELLER did not participate in the determination of this matter.

HAYS, J., participated in the determination of this matter, but retired before the opinion was filed.