887 P.2d 562

**Victoria GONZALEZ, Plaintiff/Appellee,**

v.

**Ramon S. GONZALEZ and Carol O. Gonzalez, husband and wife, Defendants/Appellants.**

**No. 2 CA–CV 94–0061.**

Court of Appeals of Arizona, Division 2, Department B.

April 29, 1994.

Review Denied Jan. 24, 1995.

Gibson, Matheson & Weber by Franklin K. Gibson, Mesa, for plaintiff/appellee.

Jones, Skelton & Hochuli by Steven L. Evans, Phoenix, for defendants/appellants.

**OPINION**

DRUKE, Chief Judge.

Victoria Gonzalez, a widow, brought an action for fraud and wrongful eviction against Ramon and Carol Gonzalez, her son and daughter-in-law. After the trial court directed a verdict on the wrongful eviction claim, the jury returned verdicts against the Gonzalezes for actual and constructive fraud, awarding compensatory and punitive damages on both verdicts but in inconsistent amounts. On appeal, the Gonzalezes raise the following issues for our review: (1) whether the fraud claims were barred by the statute of limitations, (2) whether punitive damages were properly awarded, and (3) whether the inconsistent verdicts required a new trial. Viewing the facts and inferences in the light most favorable to sustaining the verdicts, *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 758 P.2d 1313 (1988), we affirm.

Victoria owned a home in Mesa, Arizona. Her daughter Aurora Carpio and her family lived with Victoria. On March 11, 1985, Ramon stopped by to visit and said that he was looking for houses to buy. Victoria testified that she told Ramon that she would sell her house to him for "the value of the property."

A day or two later, Victoria signed a contract to sell her house to the Gonzalezes for $61,000. The contract required them to assume the existing $5,000 mortgage,[1] pay $5,000 down, and pay the remaining $51,000 balance in annual installments of $5,000 at zero percent interest. This contract was never signed by the Gonzalezes, however.

On March 13, 1985, the parties went to a title company where a title officer prepared a joint tenancy deed to the Gonzalezes that all the parties signed, a $20,000 promissory note payable to Victoria in $5,000 annual installments at zero percent interest that the Gonzalezes signed, and a $30,850 affidavit of value that Ramon signed. He later testified that the affidavit's value represented the total purchase price of the house, payable $5,000 at closing, assumption of the $5,850 mortgage, and payment of the $20,000 note.

---

1. As noted below, the actual amount due was $5,850.

The title officer caused the deed and affidavit to be recorded and gave the note to Ramon.

Over the next few months, Victoria told other family members that she had sold her house to the Gonzalezes, but that Ramon had said that she could live there the rest of her life. The Carpios, however, were required to pay rent to the Gonzalezes of $250 per month, later increased to $300 per month.

In January 1991, while Victoria and her son Miguel were reviewing what she needed to have her will prepared, he asked her for information about the sale of her house. She told him that the Gonzalezes had paid her $5,000 when they bought the house and $1,000 to $1,500 each year thereafter. When Victoria showed Miguel the $61,000 contract bearing only her signature and indicated that it was the only document she had regarding the sale, he became concerned and told his mother to get copies of the transaction from Ramon. When Ramon failed to provide the copies after four requests, Victoria asked Miguel and two of his brothers, Robert and Frank, to contact Ramon.

Miguel testified that when they met with Ramon in early March 1991, he stated that he did not know what his mother "was worried about because he had given her a notarized document indicating that he was going to pay her $56,000 for the house." When Miguel pointed out that the county records showed "that the house had been sold for $30,800 and something," Ramon said, "I don't know anything about those numbers." After further discussion, Ramon promised to give copies of the transaction to his mother the following day. When he failed to do so, Victoria, Miguel, and Frank hand delivered a letter to Ramon requesting that the Gonzalezes reconvey the house to Victoria the following week. The Gonzalezes refused and subsequently instituted forcible entry and detainer proceedings against Victoria and the Carpios and had them evicted.

## STATUTE OF LIMITATIONS

■ The Gonzalezes first contend that the three-year statute of limitations of A.R.S. § 12–543(3) barred Victoria's action for fraud because she could have, by the exercise of reasonable care, discovered the fraud in 1985. Victoria testified that until 1991, when Ramon failed to provide her with copies of the transaction, she had no concerns about the sale because she trusted Ramon and "had faith in him." The Gonzalezes assert that her trust is insufficient to excuse Victoria from exercising reasonable care to protect herself, absent a confidential relationship. We agree. See *Condos v. Felder*, 92 Ariz. 366, 377 P.2d 305 (1963). In this case, however, it is apparent that the jury found that such a relationship existed between Victoria and Ramon because it returned a verdict for constructive fraud in her favor. The jury was instructed that to return such a verdict, it had to find that a confidential relationship existed between the parties. Because this finding was based on disputed facts, it will not be disturbed on appeal unless it is clearly erroneous. *Parrish v. Camphuysen*, 107 Ariz. 343, 488 P.2d 657 (1971). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. Burr*, 126 Ariz. 338, 339, 615 P.2d 635, 636 (1980) (quoting *Palermo v. Warden, Green Haven State Prison*, 545 F.2d 286, 293 (2d Cir.1976)). From our review of the evidence and the instructions, we conclude that the jury's finding is not clearly erroneous.

The jury was told that

[t]he simple existence of a [parent and child relationship] is not by itself enough to establish a confidential relationship.... There also must be some other circumstances, such as actual dominance over plaintiff by defendants, an established course of management of plaintiff's affairs by defendants, a disability, or similar facts coupled with the family relationship, which together make the transaction involved unfair.

Thus, the jury was properly instructed on the requirements for a confidential relationship between a parent and child. See *Murillo v. Hernandez*, 79 Ariz. 1, 281 P.2d 786 (1955); *Amado v. Aguirre*, 63 Ariz. 213, 161 P.2d 117 (1945).

Second, the jury's finding of a confidential relationship is supported by the evidence. Victoria was an elderly widow who never attended school and understood little English. Miguel testified, for example, that she "cannot maintain a conversation" in English and "picks out a few words here and there." When asked if she required "assistance from someone to read documents in English," he said: "Quite a bit." Victoria testified, however, that when she signed the documents at the title company, she was told "to sign" and "neither Ramon nor Carolina explained to me what it was that I was signing."

Victoria also said that she received help with her affairs from family members, including the Gonzalezes. She testified that "Ramon took me to the Social Security office and he helped me so that I could get ... my Medicare insurance" and that Carol "took care of the problems that I had [with CIGNA insurance] because they were charging me too much."

Additionally, as noted above, Victoria had trust and faith in Ramon, which he confirmed. He acknowledged during trial that "a son has a duty to treat his mother with more consideration than he would a stranger" and agreed that Victoria "trusted that [he] would not take advantage of her." Unfortunately, the evidence shows otherwise.

The Gonzalezes purchased Victoria's house for substantially less than its lowest appraised value of $54,000 and financed most of the purchase price with a noninterest-bearing note. Moreover, Victoria's mortgage payments before the sale were $120 per month, which would have resulted in the mortgage being paid off in less than six years. After her eviction, however, Victoria's rent was over $350 per month.

We conclude, therefore, that the evidence amply supports the finding of a confidential relationship by the jury and its rejection of the Gonzalezes' defense that Victoria's fraud claim was barred by the statute of limitations.

## PUNITIVE DAMAGES

■ The Gonzalezes next contend that the evidence was insufficient to support the jury's award of punitive damages. Specifically, they argue that clear and convincing evidence was not presented to establish the "evil mind" required for punitive damages, citing *Volz v. Coleman Co.*, 155 Ariz. 567, 748 P.2d 1191 (1987). This argument is meritless in light of the jury's finding that Victoria was defrauded. In *Volz* our supreme court stated that the evil mind requirement "is satisfied by evidence 'that defendant's wrongful conduct was motivated by spite, actual malice, or *intent to defraud.*'" *Id.* at 570, 748 P.2d at 1194 (emphasis added) (quoting *Gurule v. Illinois Mut. Life & Casualty Co.*, 152 Ariz. 600, 602, 734 P.2d 85, 87 (1987)).

## INCONSISTENT VERDICTS

■ Finally, the Gonzalezes contend that the trial court erred in denying their motion for new trial based on the jury's inconsistent verdicts. On the verdict for actual fraud, the jury awarded $44,150 in compensatory damages and $92,793 in punitive damages for a total of $136,943; on the verdict for constructive fraud, it awarded $46,514 in compensatory damages and $95,157 in punitive damages for a total of $141,671. While this $4,728 inconsistency is inexplicable, the Gonzalezes have waived any error.

First, the Gonzalezes agreed to the possibility of inconsistent verdicts when their attorney stipulated that the jury be instructed as follows: "If you find for plaintiff as to both the actual fraud and constructive fraud counts, you are to award full damages for each count. The court will insure there is no double recovery." When the inconsistent verdicts were returned, the court entered judgment solely on the higher, constructive fraud verdict.

Second, when the inconsistent verdicts were returned, the Gonzalezes failed to invoke Rule 49(c), Ariz.R.Civ.P., 16 A.R.S., which provides in pertinent part that "[i]f the verdict is not responsive to the issue submitted to the jury, the court shall call the jurors' attention thereto, and send them back for further deliberation." The reason for the rule is obvious; the error is capable of correction if it is raised as soon as the verdict is returned. Failure to do so constitutes a

waiver. As the court observed in *Cundiff v. Washburn*, 393 F.2d 505, 507 (7th Cir.1968):

> Any other decision would hamper the just and efficient operation of the ... courts. It would encourage jury-shopping by litigants, permitting them to decide whether to take their chances on resubmitting the verdict and findings to the jury sitting or remain silent thereby allowing the entry of judgment and moving for a new trial before a new jury.

*See also City of Fairbanks v. Smith*, 525 P.2d 1095 (Alaska 1974); 75B Am.Jur.2d *Trial* § 1805 (1992) (challenge to consistency of verdict deemed waived unless made prior to discharge of jury).

The judgment in favor of Victoria Gonzalez is affirmed, and she will be awarded attorney's fees on appeal upon compliance with Rule 21(c), Ariz.R.Civ.App.P., 17B A.R.S.

ESPINOSA, P.J., and HATHAWAY, J., concur.