NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

# IN THE
# ARIZONA COURT OF APPEALS
## DIVISION ONE

———————————————

TEMPE WOMAN'S CLUB, an Arizona non-profit corporation,
*Plaintiff/Appellant/Cross-Appellee*,

v.

JODY LOREN and JOHN DOE LOREN, husband and wife; TEMPE CLUB
HOUSE, LLC, an Arizona limited liability company; CATHY PIPPEN and
JOHN DOE PIPPEN, husband and wife; FREDERICK TAYLOR and JANE
DOE TAYLOR, husband and wife; *Defendants/Appellees/Cross-Appellants*,

and

DIANE CALLAHAN and JOHN DOE CALLAHAN, husband and wife;
DOMINIQUE GARSIDE and JOHN DOE GARSIDE, husband and wife;
YOLANDA DANIELS and JOHN DOE DANIELS, husband and wife;
MARY ANN WOLF and JOHN DOE WOLF, husband and wife;
*Defendants/Appellees*.

———————————————

JODY LOREN; CATHY PIPPEN, *Third Party Plaintiffs/Appellees/Cross-
Appellants*,

and

DIANE CALLAHAN; DOMINIQUE GARSIDE; YOLANDA DANIELS;
and MARY ANN WOLF, *Third Party Plaintiffs/Appellees*,

v.

MARSHA PATTON and JOHN DOE PATTON, wife and husband;
SANDY HAUPT and JERRY HAUPT, wife and husband; JULIE JACKEL
and JOHN DOE JACKEL, wife and husband; LUANNE DAVIS and
MICHAEL DAVIS, wife and husband; LAUREN KUBY and MICHAEL

KUBY, wife and husband; ROBERT M. KING and MARILYNNE S. KING, husband and wife; CRAIG MEYER and JOHN DOE MEYER, wife and husband; KRISTY KIMBALL and JOHN DOE KIMBALL, wife and husband; *Third Party Defendants/Appellees.*

No. 1 CA-CV 22-0743
FILED 01-23-2024

---

Appeal from the Superior Court in Maricopa County
No. CV2019-090426
The Honorable Rodrick Coffey, Judge

**REVERSED AND REMANDED IN PART; AFFIRMED IN PART**

---

COUNSEL

Ahwatukee Legal Office PC, Phoenix
By David L. Abney
*Counsel for Plaintiff/Appellant*

Brown Law Firm, Tempe
By Christy Brown
*Counsel for Defendant/Appellee/Cross-Appellant Tempe Club House LLC*

Frederick Taylor, Chandler
*Defendant/Appellee/Cross-Appellant*

Jody Loren, Tempe
*Defendant/Appellee/Cross-Appellant/Third-Party Plaintiff*

Cathy Pippen, Tempe
*Defendant/Appellee/Cross-Appellant/Third-Party Plaintiff*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge David D. Weinzweig and Judge Michael S. Catlett joined.

---

**C R U Z**, Judge:

¶1          Appellant/Cross-Appellee Tempe Woman's Club (the "Club") challenges the superior court's rulings declining to rescind the sale of its former clubhouse to Appellee Tempe Club House, LLC ("TCH") and denying its punitive damages claim. Appellees/Cross-Appellants TCH, Jody Loren, Cathy Pippen, and Frederick Taylor ("Cross-Appellants") challenge other aspects of the court's judgment. For the reasons set forth below, we conclude the court erred in declining to rescind the sale and remand for further proceedings to determine an appropriate rescission and restitution remedy. We affirm all other challenged aspects of the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2          The Club purchased its clubhouse in 1936. The Club, having suffered financial difficulties for some time, failed to pay property taxes on the clubhouse in 2013, 2014, and 2015, which resulted in at least one tax lien being recorded against the property.

¶3          On March 29, 2017, Loren, then serving as the Club's second vice president, noticed a special board meeting. The notice she prepared stated that "IT IS IMPERATIVE THAT ALL EXECUTIVE BOARD MEMBERS attend this meeting. There are many issues that need to be addressed and cannot wait until the next scheduled board meeting in later April." Those issues included:

> 1. Club audit for past years not yet complete – unable to complete at this time.
>
> 2. Physical status of the Clubhouse and its financial status.

Loren also wrote that she had "spoken with an attorney regarding the above items, on behalf of the Club" and that she would "be bringing legal counsel to advise the board members of the urgency and necessity of the above items."

¶4          Loren attended the meeting with Taylor, who is an attorney. At the meeting, Loren proposed that TCH, which she and Pippen controlled, would buy the clubhouse for $250,000. She had previously spoken with Pippen, who was her partner in other ventures, about making an offer to buy the clubhouse. Two witnesses who attended the meeting testified that Loren pressured the board to act on her proposal by stating the Club could lose the clubhouse to foreclosure at any time. Loren denied making any such statement.

¶5        The board voted unanimously to accept Loren's proposal at the April 5, 2017 meeting, and the transaction closed on May 4, 2017. Loren, Taylor, and Pippen later recorded several deeds of trust on the clubhouse property, which they later contended were for loans they made to TCH to pay delinquent taxes and fund repairs and improvements.

¶6        In 2018, Loren listed the clubhouse for sale along with two adjacent properties for a combined $4 million. This led to a series of actions against Loren and the board. At a February 6, 2019 membership meeting, a vote was held to terminate Loren's membership. The parties dispute the validity of that vote. Competing versions of the meeting minutes indicate there was a dispute over whether honorary members' votes should be counted. If those votes were counted, the vote failed; if they were not, the vote succeeded.

¶7        On February 21, 2019, Loren, Pippen, and Mary Ann Wolf attended a board meeting at which they purported to elect Dominique Garside and Diane Callahan to the board. The minutes from that meeting acknowledge that "[a] quorum does not exist at this general board meeting."

¶8        The Club did not approve either set of February 6 minutes at the next membership meeting, at which Loren presided as president. The members again debated whether the February 6 vote to remove Loren had passed, and another motion was made to remove her, Garside, Pippen, Wolf, and another member. Honorary member votes were not counted, and the vote failed.

¶9        Approximately two weeks later, Loren presided over a board meeting attended by Pippen, Wolf, Callahan, and Garside. They elected Yolanda Daniels as treasurer and voted to suspend membership meetings for 60 days. The members nonetheless met on April 3, 2019, to discuss:

1) The February 6, 2019, minutes removing Jody Loren as a member.

2) The removal of all officers that were appointed at board meetings without the proper quorum.

3) Discussion of hiring [counsel] to help the club and ideas on how to pay him.

4) The election of new officers.

At that meeting, which neither Loren nor any other then-board member attended, the membership approved a version of the February 6 minutes showing the vote to remove Loren was successful. The attending members also voted to elect a new board, with Marsha Patton serving as president. The parties dispute the validity of that vote, but Loren did not preside over any Club meetings thereafter.

**¶10** Approximately two weeks later, the Club sued TCH, Loren, Pippen, Callahan, Garside, Daniels, and Wolf. The Club alleged Loren breached her fiduciary duty and made fraudulent misstatements in connection with the clubhouse transaction. The Club further alleged the other individual defendants aided and abetted Loren's misconduct. It sought to rescind the sale of the clubhouse, to enjoin the individual defendants from continuing to act as Club officers, and to recover compensatory and punitive damages.

**¶11** Three months later, the individual defendants filed a third-party complaint against the new board members, alleging the April 3, 2019 vote removing them was improper. On September 16, 2019, the Club amended its complaint to add Taylor as a defendant. It also amended its aiding and abetting claim to assert it only against Pippen and Taylor. In April 2020, the Club amended its complaint again to add a quiet title claim.

**¶12** The parties filed numerous dispositive motions, all of which the superior court denied. The case then proceeded to a bench trial. Following trial, the court ruled that the April 3, 2019 vote to remove the former board was valid and that Patton, as president, "had the authority to act on behalf of the Club when it commenced this action." It also largely rejected the former board members' statute of limitations defenses, finding the Club's claims accrued no earlier than May 4, 2017, when the clubhouse sale closed.

**¶13** The court permanently enjoined the former board members from acting or purporting to act for the Club. It also determined that Loren had breached her fiduciary duties and that Pippen and Taylor aided and abetted those breaches. The court declined to rescind the sale to TCH and denied the Club's punitive damages claim but awarded it compensatory damages.

**¶14** The Club, Taylor, and Pippen each moved for a new trial. The superior court denied all three motions. The Club filed a timely notice of appeal, and Cross-Appellants filed a timely notice of cross-appeal. We have jurisdiction over the appeal and cross-appeal. A.R.S. § 12-2101(A)(1), (5)(a).

## DISCUSSION

¶15        Following a bench trial, we review the superior court's legal conclusions *de novo* but defer to its findings of fact unless they are clearly erroneous. *Town of Marana v. Pima County*, 230 Ariz. 142, 152, ¶ 46 (App. 2012). A fact finding is not clearly erroneous if it is supported by substantial evidence even if there is substantial conflicting evidence. *Castro v. Ballesteros-Suarez*, 222 Ariz. 48, 51-52, ¶ 11 (App. 2009). We view the facts in the light most favorable to upholding the court's rulings. *Town of Florence v. Florence Copper Inc.*, 251 Ariz. 464, 468, ¶ 20 (App. 2021) (citing *Home Builders Ass'n of Cent. Ariz. V. City of Maricopa*, 215 Ariz. 146, 148, ¶ 2 (App. 2007)).

I.        The Club's Appeal

        A.        Rescission

¶16        The Club first contends the superior court erred in declining to rescind the sale to TCH and thereafter quiet title in the Club's favor. Rescission seeks to return contractual parties to the status quo before they entered into the contract at issue. *Hall v. Read Development, Inc.*, 229 Ariz. 277, 285, ¶ 30 (App. 2012). It is governed by equitable principles regardless of whether it arises in law or in equity. *Mahurin v. Schmeck*, 95 Ariz. 333, 339 (1964).

¶17        Generally, a party who is fraudulently induced to enter into a contract may elect to rescind the contract or affirm it and sue for damages. *Jennings v. Lee*, 105 Ariz. 167, 165 (1969). No election is necessary if the plaintiff does not seek to recover on inconsistent liability theories; in such cases, once liability is established, the plaintiff is "entitled to be made whole—whether by rescission, damages, or a combination of the two." *Caruthers v. Underhill*, 235 Ariz. 1, 6, ¶ 22 (App. 2014). Here, none of the Club's claims sought to affirm the clubhouse transaction, as its claims relating to that transaction sounded in breach of fiduciary duty and fraud. Rescission therefore was an available remedy.

¶18        The superior court has discretion as to whether to fashion an equitable remedy such as rescission. *Cal X-Tra v. W.V.S.V. Holdings, L.L.C.*, 229 Ariz. 377, 409, ¶ 106 (App. 2012). But "[r]escission will almost certainly be available when the claimant seeks to escape from an agreement that was induced by the other party's fraud or other wrongdoing." Restatement (Third) of Restitution and Unjust Enrichment § 54, cmt. b (2011); *see also id.*, § 13(1) ("A transfer induced by fraud or material misrepresentation is

subject to rescission and restitution.").[1]  The superior court found TCH's purchase was the result of Loren's fraud and fraudulent concealment. Nonetheless, the court declined to order rescission for four reasons:

1) The Club waited "approximately two years after it sold the . . . Property before seeking to rescind that sale;"

2) The Club "[was] not in a position to pay everything it would need to pay in order for a rescission to be fair;"

3) The Club had unclean hands; and

4) The Club "can be adequately compensated . . . through an award of damages."

We review each of these reasons in turn.

> **1.**  The Club Did Not Unreasonably Delay in Seeking Rescission

**¶19**  Whether a party unreasonably delayed in seeking rescission is a fact-dependent inquiry. *Caruthers*, 235 Ariz. at 11, ¶ 42.  The court may consider (1) when the party seeking rescission first made a clear and unambiguous rescission offer, (2) whether the party seeking rescission delayed in demanding rescission based on the other party's reasonable assurances, (3) whether it is possible for the property sought to be returned by the defendant, (4) whether the party seeking rescission had actual or constructive knowledge of the fraud yet manifested to the other party an intention to affirm the transaction, and (5) whether there is evidence that the party seeking rescission deliberately delayed in requesting rescission to gain an unfair advantage. *Id.*

**¶20**  The third factor favors rescission, as the record indicates TCH owned the clubhouse property at the time of trial.  The first factor does as well.  The Club contends it acted promptly in seeking rescission because Club members "continued to treat . . . Loren as President of the Club despite the fact that she had been removed as a member of the Club" and Loren therefore did not lose "her direct and indirect authority and power

---

[1] "Absent controlling authority to the contrary, we generally follow the Restatement when it sets forth sound legal policy."  *In re Sky Harbor Hotel Properties, LLC*, 246 Ariz. 531, 533, ¶ 6 (2019) (quoting *CSA 13-101 Loop, LLC v. Loop 101, LLC*, 236 Ariz. 410, 414, ¶ 18 (2014)).

to interfere with the Club's proper operations and conduct" until February 2019 at the earliest. This aligns with the superior court's findings that Loren's membership was terminated in February 2019 and that she and the other old board members "abandoned the Club by failing to participate in any meetings after March 2019."

**¶21** Appellees contend the new board did not need to "wrangle control of the club prior to bringing a lawsuit or making demands," contending "select directors began consulting with legal counsel as early as November 2018." This argument appears to refer to Patton, who at that time was the chair of the Club's board of trustees. Appellees cite no evidence or authority to suggest Patton could demand rescission on behalf of the Club while serving in that role.

**¶22** Turning to the second and fourth factors, there is no record evidence to suggest that the Club delayed demanding rescission based on anyone's reasonable assurances or that it manifested assent to the transaction after learning of Loren's fraud. And as for the fifth factor, the record shows the new board pursued this lawsuit approximately two weeks after being elected. The speed with which the new board acted strongly suggests the Club did not deliberately delay in order to gain an unfair advantage. The superior court's finding that the Club did not act promptly in seeking rescission therefore lacks evidentiary support.

### 2. Rescission Requires a Mutual Accounting

**¶23** The court also found the Club was "not in a position to pay everything it would need to pay in order for a rescission to be fair," finding that it "would have to compensate [Appellees] for the reasonable cost of . . . improvements." But conscious wrongdoers normally are not entitled to compensation for improvements they make to the property. *Edwards v. Hauff*, 140 Ariz. 373, 377 (App. 1984); *see also Curtis v. Tromble*, 155 Ariz. 429, 431 (App. 1987) (allowing compensation for expenditures because the defendant's actions were not tortious); Restatement (First) of Restitution § 158, cmt. a (1937) ("[I]f the recipient was tortious, he should bear any losses resulting from the transaction and should not benefit from profits").

**¶24** The court also determined the Club "would have to repay all of the payments it received in connection with the sale of the property including the down payment and all monthly payments that were paid . . . thereafter by [TCH]." This represents only one side of the ledger. Rescission typically requires "a mutual restoration and accounting" in which each party:

      (a) restores property received from the other, to the extent such restoration is feasible,

      (b) accounts for additional benefits obtained at the expense of the other as a result of the transaction and its subsequent avoidance, as necessary to prevent unjust enrichment, and

      (c) compensates the other for loss from related expenditure as justice may require.

Restatement (Third) of Restitution and Unjust Enrichment § 54(2) (2011). Factors commonly considered in a mutual accounting include "the seller's liability for interest on the purchase price[ ] and the purchaser's liability for the use or rental value of the property being returned." Restatement (Third) of Restitution and Unjust Enrichment § 54, cmt. h; *see also Renner v. Kehl*, 150 Ariz. 94, 98 (1986) (proper restitution for rescission of a property transaction includes "reimbursement for the fair market value of the use of the property.").

**¶25**      It does not appear the court considered these factors, nor did the parties present any evidence on them. Nonetheless, the court erred by only considering what the Club might have to repay, not what TCH might have to repay.

             3.     There is No Evidence the Club Acted with Unclean Hands

**¶26**      The court also determined the Club did "not come to the Court with completely clean hands." To constitute unclean hands, a plaintiff's bad acts "must relate to the same activity that is the basis for [the] claim." *Ezell v. Quon*, 224 Ariz. 532, 538 ¶ 26 (App. 2010). And there must be evidence that the plaintiff acted in bad faith, unconscionably, or with morally reprehensible intent. *Id.*; *see also Weiner v. Romley*, 94 Ariz. 40, 42 (1963); *King v. Uhlmann*, 103 Ariz. 136, 144 (1968).

**¶27**      There is no evidence to suggest the Club acted wrongfully in the clubhouse transaction; the court only observed that the Club "hastily agreed to sell the property . . . without obtaining an appraisal . . . and rejected an offer to purchase the property for [more] than the amount Loren offered." The court also found the board "hastily approved" Loren's proposal because she "falsely caused [it] to believe that the [clubhouse] could be taken . . . at any time prior to any judicial foreclosure process." As such, even if the board acted too swiftly, such action does not constitute unclean hands that would bar rescission.

### 4. Adequate Compensation Through Damages

**¶28** Finally, the court found the Club "can be adequately compensated . . . through an award of damages." The Club elected rescission. Once it made that election, "the court ha[d] no right to change the cause of action to the other inconsistent theory." 28A C.J.S. Election of Remedies § 3 (West 2023). This is particularly true in this case because, as discussed above, none of the Club's claims relating to the clubhouse are premised on affirming the contract with TCH and recovering damages.

**¶29** In any event, real property typically is considered sufficiently unique to warrant equitable relief. *See Woliansky v. Miller*, 135 Ariz. 444, 446 (App. 1983) (in a specific performance case, "land is viewed as unique and an award of damages is usually considered an inadequate remedy"); *cf.* Restatement (Third) of Restitution and Unjust Enrichment § 34, cmt. e ("Rescission of a completed exchange is a remedy for mistake when real property is involved, because the uniqueness of the subject matter may leave no other effective avenue of relief."). Additionally, the Club offered Patton's undisputed testimony that (1) it had owned the clubhouse and regularly met there since 1936; (2) the clubhouse is an atypical adobe structure; (3) a famous Arizona architect donated the plans; and (4) the clubhouse is listed on a historic registry of homes. Patton also testified that the clubhouse was "quite a centerpiece for the downtown [Tempe] community for some time."

**¶30** For these reasons, we conclude the superior court erred in declining to award rescission. We reverse that portion of the judgment and remand for further proceedings to (1) direct the return of the clubhouse property to the Club and (2) fashion an appropriate mutual restoration and accounting.[2] Restatement (Third) of Restitution and Unjust Enrichment § 54(2) (2011). We also vacate the damages award against Loren, Pippen, and Taylor because it is premised on TCH retaining the clubhouse property. On remand, the superior court should consider whether Loren, Pippen, and/or Taylor, each of whom placed liens on the clubhouse property, should pay restitution so that they are not unjustly enriched. Restatement (Third) of Restitution and Unjust Enrichment § 54(1); *see also id.*, cmt. i (stating that a

---

[2] Because we reverse on this issue, we need not address the Club's post-oral argument request that we take judicial notice of several newspaper articles that it contends show the clubhouse and the underlying land "are unique and . . . a distinctive part of Tempe's and Arizona's history."

plaintiff who successfully obtains rescission also may recover incidental and reliance damages).

### B. Punitive Damages

¶**31** The Club also contends the superior court erred in declining to award punitive damages. To recover punitive damages, a plaintiff must prove something more than the underlying tort. *Saucedo ex rel. Sinaloa v. Salvation Army*, 200 Ariz. 179, 182 (App. 2001). It must show not only that the defendant "engaged in tortious conduct of any kind, intentional or negligent—that is, acted with an 'evil hand,'" but also that "the defendant engaged in such conduct with an 'evil mind.'" *Swift Transp. Co. of Ariz. L.L.C. v. Carman in and for County of Yavapai*, 253 Ariz. 499, 506, ¶ 22 (2022). Proving "evil mind" requires "clear and convincing evidence that the defendant's actions either (1) intended to cause harm, (2) were motivated by spite, or (3) were outrageous, creating a 'substantial risk of tremendous harm to others.'" *Id.* (quoting *Volz v. Coleman Co.*, 155 Ariz. 567, 570-71 (1987)). We review the superior court's punitive damages ruling for an abuse of discretion. *Miscione v. Bishop*, 130 Ariz. 371, 375 (App. 1981); *see also Ahmed v. Collins*, 23 Ariz. App. 54, 58 (1975) ("Punitive damages are not to compensate for a loss, but rather to punish for misconduct, and it must, therefore be a matter of discretion for the trier of fact.").

¶**32** The Club contends in conclusory fashion that Cross-Appellants:

> [A]cted with the requisite evil mind because they engaged in outrageous and aggravated conduct with the clear intent to bilk, injure, and harm [the] Club by fraudulently taking away its beloved . . . Club House and selling it for a vastly greater price than they offered in the small, highly unfavorable (from the Club's perspective) sales contract that they had fraudulently tricked the Board into approving.

Proving fraud does not automatically entitle a plaintiff to punitive damages. *Hunter Contracting Co. v. Sanner Contracting Co.*, 16 Ariz. App. 239, 246 (1972); *see also Rawlings v. Apodaca*, 151 Ariz. 149, 162 n.8 (1986) ("[P]unitive damages are not recoverable in every fraud case, even though fraud is an intentional tort."). And the Club cites no evidence to suggest Cross-Appellants, or any of them, "acted with the requisite evil mind." We cannot say the superior court abused its discretion by finding the Club did not satisfy "its burden of proof to warrant an award of punitive damages."

II.     The Cross-Appeal[3]

        A.      Cross-Appellants' Statute of Limitations Defenses

                1.      Breach of Fiduciary Duty Against Loren

**¶33**         Cross-Appellants first contend the Club's breach of fiduciary duty claim against Loren was time-barred.  Breach of fiduciary duty claims are subject to a two-year limitations period. *Coulter v. Grant Thornton, LLP*, 241 Ariz. 440, 444, ¶ 9 (App. 2017) (citing A.R.S. § 12-542).  Whether a statute of limitations applies generally presents questions for the finder of fact. *Marquette Venture Partners II, L.P. v. Leonesio*, 227 Ariz. 179, 184, ¶ 19 (App. 2011).

**¶34**         The finder of fact in this case—the superior court—determined the Club's April 18, 2019 complaint was timely because the Club "did not suffer any damages until the [clubhouse] was transferred to [TCH] . . . on May 4, 2017."  Cross-Appellants contend the Club's claim instead accrued when the old board voted to accept Loren's offer on April 5, 2017, citing *Mining Investment Group, LLC v. Roberts*, 217 Ariz. 635 (App. 2008).  There, we stated that an executory contract for the purchase of real property "operates to pass to the buyer an equitable interest in the land and to the seller an equitable interest in the purchase proceeds." *Id.* at 638-39, ¶ 13.

**¶35**         *Mining Investment Group* involved a written purchase contract that presumably satisfied the statute of frauds. *Id.* at 637, ¶ 2; *see* A.R.S. § 44-101(6) (sale of real property requires a promise or agreement "in writing and signed by the party to be charged").  Here, the parties did not document the sale of the clubhouse until May 1, 2017, when they executed a

---

[3] The only person present at the November 29, 2023 oral argument for any of the Appellees/Cross-Appellants was Taylor, who at that time was suspended from the practice of law.  Taylor stated he was appearing on his own behalf but shortly thereafter stated that he represented Appellees/Cross-Appellants.  When we admonished Taylor that he could only represent himself due to his suspension, he responded that it was his understanding that "someone had to represent all the parties at the podium."  Taylor then presented argument as to the aiding and abetting claim against him, the claims against Loren, and the Club's claim for rescission, which could only be enforced against TCH.  We refer this matter to the State Bar of Arizona for any investigation and proceedings as it may deem appropriate.

promissory note and deed of trust. And while Cross-Appellants rely on the April 5, 2017 meeting minutes, they do not contend those minutes satisfied the statute of frauds.

¶36            Cross-Appellants also overlook the superior court's ruling that Loren was liable for fraudulent concealment based on clear and convincing evidence that she made "knowingly false" statements during the April 5, 2017 meeting. Fraudulent concealment tolls the applicable limitations period "until such concealment is discovered, or reasonably should have been discovered." *Walk v. Ring*, 202 Ariz. 310, 319, ¶ 35 (2002) (citation and internal quotation marks omitted). Cross-Appellants do not challenge the court's fraudulent concealment findings on appeal. Indeed, Loren conceded that the meeting notice she drafted for the April 5, 2017 meeting did not give the other board members notice to come prepared to discuss the clubhouse's value. And witnesses on both sides, including Loren and Pippen, testified they did not know whether the $250,000 offer was low, high, or reasonable when Loren made it. The court therefore did not err in finding the breach of fiduciary duty claim was timely.

2.            Aiding and Abetting Claim Against Taylor

¶37            Cross-Appellants next contend the Club's aiding and abetting claim against Taylor was time-barred because (1) the Club named him as a defendant for the first time in its September 16, 2019 first amended complaint and (2) the claim does not relate back to the original complaint under Arizona Rule of Civil Procedure ("Rule") 15(c). The same limitations period applies to the Club's aiding and abetting claims. *American Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1478-79 (Cal. Ct. App. 2014).

¶38            Despite seeking summary judgment on other statute of limitations issues, Cross-Appellants did not raise this argument either before or at trial. They instead raised the issue for the first time in their post-trial proposed findings of fact and conclusions of law. Moreover, Taylor did not raise this issue in his motion for new trial. Cross-Appellants therefore cannot raise it now. *See BMO Harris Bank N.A. v. Espiau*, 251 Ariz. 588, 593-94, ¶ 25 (App. 2021) ("[L]egal theories must be presented timely to the trial court so that the court may have an opportunity to address all issues on their merits.") (citation and internal quotation marks omitted).

### 3. Aiding and Abetting Claim Against Pippen

**¶39** Cross-Appellants next contend the Club did not properly plead its aiding and abetting claim against Pippen, citing one paragraph that appeared in the Club's first and second amended complaints:

> At this pleading stage of the case, [the Club] is not aware whether Defendant Pippen provided substantial assistance to Ms. Loren with respect to Ms. Loren's acquisition of the Clubhouse Property, and therefore does not affirmatively allege that she aided or abetted that breach of fiduciary duty.

The Club also alleged, however, that Pippen aided and abetted Loren's fiduciary duty breaches in other ways, including "contemporaneously or subsequently providing material assistance . . . in the form of loans to Ms. Loren and/or [TCH], and by encumbering the Clubhouse Property with liens."

**¶40** Cross-Appellants also contend the superior court erred in finding "[t]he issue of whether Pippen aided and abetted Loren's breach of fiduciary duty was tried by the parties." *See* Ariz. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if it had been raised in the pleadings."). We disagree. Both sides discussed the aiding and abetting claim against Pippen in their pretrial statements. The Club contended Pippen "was aware . . . of Defendant Loren's purchase of the Clubhouse Property because she was Defendant Loren's 'partner'" in TCH and "loaned money and other services to Defendant Loren." And Cross-Appellants contended that "[l]oans provided later by Mr. Taylor and Ms. Pippen to pay the liens, finish the purchase, and fund maintenance and improvements did not assist Ms. Loren in her conduct on April 5." The parties then presented evidence at trial regarding Pippen's loans to TCH. This claim was squarely before the court.

### B. New Board's Authority to Direct the Club to Pursue This Lawsuit

**¶41** Cross-Appellants also challenge the superior court's findings that the new board elected at the April 3, 2019 meeting could authorize the Club to sue.

¶42          The superior court's conclusions on this issue hinge on its finding that Loren was removed as president and as a member at the February 6, 2019 meeting.   Cross-Appellants concede there was "a disagreement" regarding the February 6, 2019 vote to remove Loren and that "[s]everal different versions of proposed minutes of [that] meeting were drafted."   They also concede one of those versions—one that showed Loren had been removed—was approved at the April 3, 2019 meeting that neither Loren nor any other old board member attended.   The record also suggests Loren did not preside over any Club meetings after April 2019.   As such, while Cross-Appellants disputed that Loren was properly removed, the court had discretion to resolve the conflicting evidence on this issue.   *See Lake v. Hobbs*, 254 Ariz. 570, 574, ¶ 13 (App. 2023) ("The superior court [in a bench trial] assesses witness credibility, weighs the evidence, and resolves conflicting facts and expert opinions, all factual determinations to which we defer.").

¶43          The superior court reasoned that, because Loren had been removed on February 6, the February 21 board meeting Loren called was invalid.   Additionally, as only three old board members attended that meeting, the board lacked a quorum.  Those members—Loren, Pippen, and Wolf—nonetheless attempted to elect Garside and Callahan to the board.  Cross-Appellants cite Article V, section 9 of the Club bylaws to contend a quorum is not needed to elect new board members.  That section states:

> Whenever any vacancy occurs in the Board it shall be filled
> without delay by a majority vote of the remaining members
> of the Board at a regular Board meeting.

This section does not exempt new board member elections from the quorum requirement of Article V, section 7.

¶44          The superior court also found "the actions putatively taken by the [old] Board on March 21," including the approval of a 60-day "General Meeting Suspension," were invalid.   As Loren, Garside, and Callahan each were necessary to have a quorum at that meeting, we cannot say the court abused its discretion in reaching that conclusion.

¶45            Cross-Appellants also contend the April 3, 2019 new board election was invalid because "the [old] board members needed to be terminated from their positions as a preliminary step."  They further contend removal of board members and election of new board members "were processes assigned to be board of director functions."  The court did not find the old board members were removed; it instead found they had forfeited their positions.  Article V, section 8 of the bylaws states that "[a]ny member of the Board who fails to fulfill any of her duties as set forth in these Bylaws shall automatically forfeit her seat on the Board."  The court found the old board members had "failed to fulfill their duties by continuing to recognize Loren as President . . . even though her membership had been terminated on February 6" and had "abandoned the Club by failing to participate in any meeting after March 2019."  Cross-Appellants do not challenge these findings.

¶46            Finally, Cross-Appellants contend "[t]here is no evidence that the [new board] . . . authorized the corporation to hire an attorney and bring suit."  We disagree.  The approved February 6, 2019 minutes reflect the passing of a motion "to retain a lawyer for the members."  And the April 3, 2019 minutes indicate efforts were underway to raise funds for a retainer to hire counsel with a first objective of "get[ting] the bank account in control of our treasurer, president and vice president."  Those minutes also evince the formation of an "ad hoc committee . . . to work with the lawyer to get documents he might need."

¶47            Cross-Appellants also cite A.R.S. § 10-3801(B), which generally provides that "[a]ll corporate powers shall be exercised by or under the authority of and the affairs of the corporation shall be managed under the direction of its board of directors."  Those powers include the power to sue and be sued.  A.R.S. § 10-3302(1).  The Club bylaws grant the board authority to manage the Club's affairs but also give the president "general and active management of the business of the Board."  Cross-Appellants cite no bylaw or other evidence suggesting the president elected at the April 3, 2019 meeting—Patton—could not authorize the filing of the Club's complaint two weeks later.

## CONCLUSION

¶48        We reverse the court's ruling declining to grant rescission, vacate the damages award, and remand for further proceedings to determine an appropriate rescission and restitution remedy. We affirm all other aspects of the judgment. The Club is the successful party on appeal on balance and may recover its taxable costs upon compliance with Arizona Rule of Civil Appellate Procedure 21.



AMY M. WOOD • Clerk of the Court
FILED:    TM